## McCRARY v. McCRARY. (No. 9384.)

(Court of Civil Appeals of Texas. Fort Worth. Dec. 4, 1920. Rehearing Denied Jan. 22, 1921.)

**1. Appeal and error ⬅➡722(1)—Assignments not consecutively numbered need not be considered, but may be.**

Where the assignments of error were not consecutively numbered from first to last, as prescribed by Court of Civil Appeals Rule 29, (142 S. W. xii), but were designated by numbers not running consecutively, the Court of Civil Appeals would be justified in disregarding those assignments, but it may consider them.

**2. Divorce ⬅➡148—Instruction that evidence must be full and satisfactory properly refused.**

Vernon's Sayles' Ann. Civ. St. 1914, art. 4633, requiring the decree of divorce to be rendered on full and satisfactory evidence, is a direction to the court, and does not establish a rule to guide the jurors as to the burden of proof, so that, after the court had charged that the burden was on plaintiff to make out his case by preponderance of the evidence sufficient to satisfy the jury, a charge requested by defendant that the burden was on plaintiff to establish material allegations by full and satisfactory evidence was properly refused.

**3. Divorce ⬅➡149—Court can deny, notwithstanding verdict for plaintiff.**

Under Vernon's Sayles' Ann. Civ. St. 1914, art. 4633, requiring the divorce decree to be rendered on full and satisfactory evidence, on the verdict of the jury, if a jury is demanded, or on the judgment of the court, it is the trial court's duty to refuse the decree, if after the jury found for plaintiff the trial judge, in the exercise of his judicial discretion did not find the material facts had been established by full and satisfactory evidence, though he could not ignore the verdict and award a divorce to defendant; his authority over the verdict being restrictive, and not independent.

**4. Divorce ⬅➡129(9)—Circumstantial evidence must conclusively show adultery.**

In an action for divorce on the ground of the wife's adultery, the charge against her may be proved by circumstantial evidence; but such evidence must conform to the rule, applied in criminal prosecutions, that each fact necessary to the conclusion must be proved beyond a reasonable doubt, that all such facts must be consistent with each other and with the ultimate fact, and that, taken together, they must be conclusive, producing a reasonable and moral certainty that the wife was guilty.

**5. Divorce ⬅➡127(3)—Decree should not be granted on husband's uncorroborated testimony of adultery.**

In action by husband for divorce on the ground of the wife's adultery, the decree should not be based on his uncorroborated testimony as to the charge.

**6. Evidence ⬅➡123(6)—Declarations of divorce corespondent held part of res gestæ.**

In an action for divorce on the grounds of the wife's adultery, declarations by the alleged corespondent, denying guilt, made to a witness immediately after the husband had found his wife and the corespondent together in a room, are admissible as parts of the res gestæ.

**7. Divorce ⬅➡129(14)—Evidence of finding wife and man in room together held insufficient to establish adultery.**

In an action for divorce on the ground of the wife's adultery, evidence by the husband of finding his wife and another man in a room together under suspicious circumstances, uncorroborated by the testimony of any other witness as to those circumstances, and only to a slight extent by testimony of associations of the wife with other men, which were not of a suspicious character, held insufficient to warrant granting the decree, in view of the denials of wife and the other man and their explanation of the situation.

**8. Divorce ⬅➡109—Presumption of innocence applies as in criminal prosecutions.**

In a suit for divorce on the ground of the wife's adultery, the wife is entitled to the same presumption of innocence as if she were being prosecuted for the offense.

### On Motion for Rehearing.

**9. Divorce ⬅➡124—Guilt must be established the same as in criminal prosecution; "full and satisfactory evidence."**

Vernon's Sayles' Ann. Civ. St. 1914, art. 4633, requiring the divorce decree to be rendered upon full and satisfactory evidence, imposes upon plaintiff substantially the same burden as that imposed upon the state in a criminal prosecution to establish the offense charged beyond a reasonable doubt.

**10. Appeal and error ⬅➡832(1)—On motion for rehearing, statement in original opinion held not contrary to evidence.**

A statement in the original opinion that there was no evidence that the defendant wife had ever met men in the dark is not contrary to evidence of her meeting men in the evening, where the witness testified he was mowing a lawn and saw the defendant at a distance of 200 or 300 yards, so that the statement need not be corrected on a motion for rehearing as misleading.

**11. Courts ⬅➡247(6)—Petition to certify divorce action to Supreme Court denied.**

An action for divorce, in which one judge of the Court of Civil Appeals dissented from the opinion that the evidence was insufficient to warrant the decree for plaintiff, will not be certified to the Supreme Court, in view of Rev. St. 1911, art. 1521, giving the latter court jurisdiction over questions of law only, and Vernon's Sayles' Ann. Civ. St. 1914, art. 1590, making the judgment of the Court of Civil Appeals conclusive on the facts, and article 1591, making it conclusive on law and fact in cases of divorce, especially when it would

⬅➡For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

result in great delay in the determination of the case to certify it.

Buck, J., dissenting.

Appeal from District Court, Denton County; C. R. Pearman, Judge.

Suit for divorce by J. A. McCrary against Emma McCrary, in which the defendant by cross-bill also sought a divorce. From a judgment awarding a divorce to plaintiff, and giving him the custody of the only child, defendant appeals. Reversed and remanded.

McLean, Scott & McLean, of Fort Worth, S. M. Bradley, of Denton, and W. S. Ray and J. Lee Zumwalt, both of Dallas, for appellant.

Owsley & Owsley, of Denton, W. W. Alcorn, of Montague, and Sullivan, Speer & Minor, of Denton, for appellee.

CONNER, C. J. Appellee sued appellant for divorce alleging that she had been guilty of adultery with one Dee Price. Appellant, by cross-bill, also sought a divorce, alleging cruel treatment, consisting of personal violence to her, and the charge of adultery alleged in plaintiff's petition. The cause was tried before a jury upon a general charge, which submitted only the issue of defendant's adultery. The jury returned a verdict for plaintiff. The court rendered judgment for plaintiff, and awarded him the custody of the only child of the marriage, John A. McCrary, Jr., a boy about six years old. The defendant has appealed. The division of the community property is not involved in this appeal; the parties to the suit having settled their property interests in accordance with the judgment below.

[1] The appellee objects to the consideration of appellant's assignments, because they are not numbered from first to last in their consecutive order, as prescribed by rule 29, prescribed by the Supreme Court for the preparation of briefs in the Court of Civil Appeals (142 S. W. xii). The first assignment found in appellant's brief is numbered the "fifth," and the second assignment is numbered the "fourth." The third assignment is designated as the "first." This practice is in direct violation of rule 29, heretofore mentioned, and under such rule we would be justified in disregarding such assignments. Taylor v. Butler, 168 S. W. 1004; Bryant v. Traction Co., 52 Tex. Civ. App. 600, 115 S. W. 880. But we have concluded to consider them, even though in violation of said rule.

[2] The fourth and fifth assignments allege error in the failure of the court to charge the jury that in this case the burden of proof was upon the plaintiff to establish the material allegations in his petition by full and satisfactory evidence. The court did

give an acceptable charge that the burden of proof was upon the plaintiff to make out his case by a preponderance of the evidence, "and the evidence must be sufficient to satisfy the jury of the truth of the matters so alleged." We think the charge given was sufficient, and that it would have been error to have given the tendered charge. Article 4633, V. S. Tex. Civ. Stats., reads in part as follows:

"In all suits and proceedings for divorce from the bonds of matrimony, the defendant shall not be compelled to answer upon oath, * * * but the decree of the court shall be rendered upon full and satisfactory evidence, upon the verdict of a jury, if a jury shall have been demanded by either party, and if not, upon the judgment of the court affirming the material facts alleged in the petition."

This part of the statute has been construed by our Supreme Court and the Courts of Civil Appeals a number of times to be a direction to the court, and not as establishing a different rule to guide jurors as to the burden of proof. In Moore v. Moore, 22 Tex. 239, our Supreme Court, speaking through Judge Wheeler, said:

"The law has wisely enjoined upon the courts the duty of watching over these proceedings with the strictest scrutiny, and interposing to prevent abuses of the delicate and responsible power confided to them to dissolve the marriage contract. What shall be deemed sufficient cause of divorce must ever be matter of law; and the law has made it the duty of the judge to refuse a decree, unless satisfied of the truth and sufficiency of the evidence, by which those causes are established. * * * There must be the 'full and satisfactory evidence,' and 'the verdict of a jury'; both must concur, before the court can lawfully proceed to decree a divorce. It is to the mind of the court, of course, that the statute intends that the evidence shall be 'full and satisfactory.' Unless it be so, it is the duty of the court to set aside the verdict and refuse a decree. In decreeing a divorce, the judge does not proceed, as in other cases, upon the verdict of the jury, but upon his own judgment, after the jury, by their verdict, have affirmed the truth of the material allegations of the petition. The mind of the judge must be satisfied, not only of the sufficiency of the causes alleged, but of the truth and sufficiency of the evidence by which they are established, independently of the verdict."

To the same effect are the cases of Haygood v. Haygood, 25 Tex. 577; Barrow v. Barrow, 97 S. W. 120; Allen v. Allen, 128 S. W. 697; Speer, Law of Marital Rights, §§ 540 and 547; 9 Ruling Case Law, p. 328; 14 Cyc. p. 687. The two assignments are overruled.

[3] The appellant cites a number of cases in support of her first assignment, complaining of the action of the court in refusing to give a peremptory instruction against plaintiff upon his cause of action. It was the

duty of the trial court to refuse the decree, if, after the jury had found for plaintiff, the judge, in the exercise of his judicial discretion, did not find that the material facts contained in plaintiff's petition had been established by "full and satisfactory evidence." He had the power, though it was a trial by jury, to refuse either party a divorce, but not to ignore the findings of the jury and award a divorce to defendant. Grisham v. Grisham, 185 S. W. 959. In other words, the court's authority over the verdict of the jury in a divorce case is restrictive, and not independent; negative, and not affirmative.

In the view of the majority, and as indicated by our statutes and decisions cited, every decree dissolving the sacred rights of matrimony between two individuals must be based upon "full and satisfactory evidence." As said in the case of Lohmuller v. Lohmuller, 135 S. W. 751:

"In suits for divorce the same respect is not required for the verdict of a jury as in other cases, and the trial judge in decreeing a divorce does not proceed upon the verdict, but upon his own judgment, and, when the cause reaches this court, it, too, must be convinced that the evidence is 'full and satisfactory,' before it will affirm a judgment."

It is therefore our duty to scrutinize the testimony closely, and from it determine whether or not the evidence in this cause fulfills the requirements of the statutes and of the decisions on that subject. It will not be improper, we feel sure, to first present as briefly as we may a general view of the case. In divorce cases the jurisdiction of this court is final, and an affirmance of the judgment below will constitute a perpetual judicial record that Dee Price, the corespondent named, was guilty of wrecking a home, and that the appellant in this case was guilty of adultery, the one crime by a woman for which it is said there is no forgiveness this side of Heaven. An almost certain consequence of that charge, and of such a decree, is to subject the woman to the scorn and contempt of her sisters and to the avoidance and disregard of all men whose confidence and esteem is most to be desired. The little boy, too, innocent though he is, is thereby deprived of a mother's love and forced to meet the ignominy that attaches to the mother who is an adulteress. In view of such consequences, and others that may easily be imagined, the three members of this court have carefully read the entire statement of facts in this case more than once.

[4] In addition to the rule of the statute requiring full and satisfactory evidence before a decree of divorce in any case shall be entered, there is yet another rule that applies in the case before us. It is undisputed that no one was able to testify that he or she witnessed the commission of the act charged. On the contrary, it is conceded that the judgment and verdict rests alone upon circumstantial evidence. And while the crime of adultery, as well as other charges, may be proved by circumstantial evidence, yet because of the frequent miscarriages of justice in such cases, and of the frequent misleading inferences drawn from circumstances, our courts apply the following rule, quoted with approval by our Supreme Court as early as 1855:

"In order to warrant a conviction of a crime on circumstantial evidence, each fact necessary to the conclusion sought to be established must be proved by competent evidence beyond a reasonable doubt; all the facts [that is, the facts necessary to the conclusion] must be consistent with each other and with the main fact sought to be proved; and the circumstances, taken together, must be of a conclusive nature, leading, on the whole, to a satisfactory conclusion, and producing in effect a reasonable and moral certainty that the accused, and no other person committed the offense charged."

See Henderson v. State, 14 Tex. 503, loc. cit. 514.

With the foregoing general observations, let us examine the circumstances relied upon in this case to establish the guilt of the appellant. The appellee, John McCrary, testified that he had been living in the town of Denton for 13 or 14 years; that he and appellant, Emma McCrary, were married on the 10th day of January, 1911; that he was engaged in running a plumbing business; that as a result of the marriage one child was born to them on April 19, 1913; that he was 24 or 25 years old when they were married, and 32 at the time of the trial; that he separated from his wife on the 14th day of May this year at Mineral Wells; that the reason for the visit of himself and wife to Mineral Wells was that his wife said she had kidney trouble and wanted to go for the benefit of her health; that he went with her and took the little boy along, going by the way of Forth Worth.

In view of the gravity of the issues involved and of the conflict of opinions among us, we will here quote freely from the testimony, omitting such parts only as amount to mere repetitions and details that throw no light upon the subject. Appellant thus testified:

"When we were at the depot, preparing to depart for Mineral Wells, I saw Dee Price talking to my wife. At that time I had absolutely no suspicion of my wife. When we arrived at Mineral Wells, we finally secured a room at the Post Office Hotel and paid for it one week in advance. The room number was 10 on the second floor. * * * There were two windows to the room, one on the south and one on the east; there was no room to the east of us; the window there opened out on a porch, as did the south window; the porch ran around two sides of the room, and there was a stairway leading from the southwest corner of this porch to the ground.

"I did not see anything else of Dee Price

after we left Denton until we got to Mineral Wells. I saw him there setting in front of the Crazy Hotel. It is more than three blocks from the Crazy Hotel, where he was sitting, to the Post Office Hotel, nearer four—two full streets north, and one running east and west, and one half lot. My little boy, John, Jr., was with me when I saw Dee Price there. We had a conversation, in which he proposed that he would take us out riding, and I told him we were on our way to the bathhouse to take our bath. Dee Price had been up to my room before this and had a conversation with my wife, just a few words, I suppose, and about that time I walked up, and I talked a few minutes, and he left and went down the steps leading from this porch on the outside; I judge that was about 8 o'clock. When he came there, I was in the bathroom with John, Jr., bathing him, and I found this man in front of the door of my room, and my wife was in the door. After I spoke, and we had a few words, I asked my wife if we might come into the room, and she said, 'No'—it had not been cleaned up, and she would rather we did not come in.

"Dee Price said at that time that he was on his way to Ranger, and that it had rained, and he would probably be in Mineral Wells for a day or so on account of this rain. He gave as his reason for coming up to our room that he had noticed our names on the register, and had gotten the negro porter to help him locate us, as he was anxious to see some one from his home town. When Dee Price left our room that morning, he left by way of the stairway on the porch, and left me on the porch at the end of the hall. I would not say those stairs were in bad condition; had probably two or three steps off at the bottom.

"As near as I can recall it was something near 20 minutes after he left me there on the porch until I passed him at the Crazy Hotel. With reference to what occurred there, he said he would be there for a day or so, and would take us out riding, and I said I would certainly like to go, and I knew my wife would; we had not had any outing, and I felt sure she would appreciate it; but I said my little boy and myself will be gone to the bathhouse for something like an hour and a half. I had left my wife at the hotel at that time. I did not tell Dee Price that she was there. I told Dee we always took our bath before breakfast, and as soon as we were through with our bath we would be glad to take a ride with him. We went on to take our bath, and the manager of the bathhouse would not allow me to take my little boy in with me; I had been allowed that privilege at the other bathhouses where I had gone, and I refused to take any bath at that house, but went back down the street to the bakery, and bought some cakes there, and started back up the street, and the little boy began asking me to go with him back to the room, and I said, 'I will just take you back to the room and leave your cakes,' and we started on back leisurely along there, and when we got back to the hotel we went right on up to the room, and he walked up and got hold of the knob of the door and tried to open it; the door was locked, and when he found it locked up he took his little hand and knocked two or three times, and no one answered, not a word said, and I did not hear any sound after I walked into that hall. I then walked out on the porch east of the room, and walked up to the window, and saw that the blinds to this window were pulled down. I had no suspicion then of anything. I walked back in front of the door, and said, 'Mother, let us in,' and the little boy said, 'Mama, we want in,' or something like that, and several seconds passed, and Price opened the door.

"When Dee Price opened the door, he was standing there with his pants all unbuttoned, and my wife was sitting in front of the mirror with some false hair, pretending like she was pinning that on her head. The room was in a worse condition then than it was at the time she refused to let Price in when I was present; her corset was on the back of the chair, and on the bed opposite mine lay her silk drawers. I had never seen those silk drawers before. When I got into the room and saw Dee Price in that condition, I hardly know what I did. I said, 'What does this mean?' and he said, 'It don't mean anything;' and I said, 'If it don't mean anything, what are you doing standing there with your pants unbuttoned?' and while he was making this talk he got back in the door with the door open; he had his hand on this door, holding it, and I said to my wife, 'I have always tried to respect you; I had no idea you would start whoring around this way,' and I run my hand back, and took out my knife, and opened it, and started towards Price, and when I did that she walked up and says, 'You stand there,' and then Price pulled the door to.

"When I got in there, she had a loose apron slipped over her head. When I started towards Price, she then opened the door, and I told her to get out, and she got out; that is about all that happened so far as I know; after she was outside, I locked the door. I did not go into the hall myself, and sat down in a chair with the baby, and after a while I started to pack my suit case; we had two, and I left her one. About this time she said, if I would give her the money, she would go home, and, when she said that, Dee Price said, 'I will give you money,' and she replied to him, 'I don't need any of your money.' I went down town and put some money in a Mineral Wells bank for her to come home on, and had another party phone her the money was in the bank there for her, and came on home with my child. I have never lived with her since that time. I have been taking care of the child, and he is doing fine. * * *

"There were two different ways of locking the door, a lock and key and this screen latch on the inside. When I got to the room, I did not try to see into it; the screen door on the outside was pushed back against the wall, with an old cane-bottom chair with the bottom out of it set up against that door. This was on the second floor. * * * I should judge that it was from 20 to 40 minutes from the time I left Dee Price there at the Crazy Well Hotel to take my bath until I returned, something like that; I had told Dee Price it would take me an hour and a half or more to take my bath. I remained in the room something like 20 minutes after Dee Price was up there the first time before I started to take my bath, and we walked leisurely along; I guess it took 10 or 15 minutes with the child; I had to give him time to keep up; of course I could have walked it in a few minutes myself, and it was

probably 10 or 15 minutes from the time I left Dee Price until I got back to the room at the Hotel. * * *

"I could not say positively whether I have paid any personal bills of my wife since the 14th day of May or not; I have not sent her any money or contributed anything to her support; she did not ask for it. I have had charge of my child and hers, too, since the 14th day of May. * * * I never committed any assault upon my wife; never struck her before the baby's birth, or at any time. I remember the occasion we planned to have a Christmas tree for the child; I got the tree and the toys and everything. I did not come home with a necktie on; I had one I had gotten for a Christmas present, and my wife objected to my wearing it; but I did not knock her down and cut her with the scissors; never hit or choked her in my life; never threatened her with a pistol. We did not have the Christmas tree. * * *

"I said that up until the 14th day of May of this year I have never suspicioned my wife; never questioned her in my life; never questioned it. I remember the occasion of her going to Taylor's Lake bathing, and I never at that time made any accusations against her. * * * I believe I have made four trips (to Mineral Wells) since the 14th day of May; I made the first trip shortly after the 14th, some time after the 20th of May. * * * I saw Dee Price in conversation with my wife at the station the day we left for Mineral Wells; I was buying the tickets at the time, and when I got the tickets bought I went back to my wife and baby. Price was not there then; he had just walked off. I do not know how long I was buying the tickets, some few minutes; don't remember how long it was until the train came; we waited around there some few minutes. It seems to me that we got to Mineral Wells the night of the 10th of May a little before sundown. We visited the Crazy Hotel, but did not stay there; we did not try to get a room there, and did not register there, but we registered at one of the drinking fountains there the next day. * * *

"I did not swear a while ago that the first time I saw Dee Price, after I had seen him talking to my wife in the depot at Denton, was when I met him in front of the Crazy Hotel; I said the first time was in front of the room; if I swore that, it was not intentional. I said the baby was in the bathroom at the time Dee Price came up there; he was not taking a bath, but using the toilet. I don't think we had been up long at that time; the baby usually got up when we did. He had his clothing on at that time. I do not remember about whether he had already been washed and dressed by his mother. I know it is not a fact that at the time I asked if Dee Price could come into the room, she was engaged in washing and dressing him; I absolutely swear that. I think we got up some time before 8 o'clock; Dee Price came up there some few minutes after 8 o'clock, and I remained there in the room about 20 minutes, washing and dressing the little boy; had to change his clothing or something. I know, after Price left, I had to put on his little coat; I know something had to be done, I don't remember just what; nothing specially to call my attention to it. After we put on his clothes, I always take him to the toilet, and wash his hands and face, and as I recall that is about what was done; if I told you awhile ago I had to put his clothes on, that was a mistake on my part. * * * I took a bath Monday the 12th and Tuesday the 13th; took one at the Crazy; my wife was going to take her bath at the Lamar the 14th, where she had taken the other two. When I left the room at the hotel, my wife asked me to leave her money to take her bath, and I left a dollar. * * * I went direct from my room to the bath house, until I met Price out there and stopped. * * * I only stopped long enough to have a few words with Dee Price in front of the Crazy Hotel and then went directly to the bath house. * * * I was gone from the place where I had the conversation with Dee Price before I got back to the Post Office Hotel, as I stated awhile ago, 20 to 40 minutes, and I figure that I was gone from the room 30 to 50 minutes. I did not state that I was gone from the room 20 to 40 minutes; I think it was from 30 to 50 minutes; something like that, after I left the Post Office Hotel; I did not pay strict attention to the time.

"I did not see Dee Price at any time from the time I left my room until I got back, except when I talked to him at the Crazy Hotel. * * * The next time I saw him was in the room up there with my wife, from 20 to 40 minutes after I had talked with him; when I had that talk with him, I told him I would be glad to go [driving], and I was sure my wife would; I do not know anything about any conversation he and my wife had in this room. I did not know anything about the reputation of this Post Office Hotel; I have not since learned that its a place where they kept lewd women; I have heard some remarks about the place, but the same remarks were made about every place in town; I afterwards learned its reputation was bad. * * *

"The lock on that door was just an ordinary lock; the key to it was there, but we did not use it; I did not see the key, that I know anything about, in that lock, but the door was locked—fastened so that I could not open it; I could not say that the lock was turned, but it could have been, if you had a key; I did not see any key in the door; I think I did after that; I did not see any key in the possession of Dee Price, either before or after that. It was some little time from the time I got there and tried to get into the room until I got in; a minute and a half or maybe two minutes, I do not know. * * *

"I have gone down that stairway that led down from the porch, but I never saw anybody come up that stairway; me and the boy went down it a time or two, but it was not in good condition; you could get down by being careful. I just made some remark to Price, when he went down that stairway, about being careful, the stairs were in bad condition; nothing particularly unusual, nothing particular bad about it, except the bottom steps were out. * * *

"I always felt that the child and his mother had a strong feeling for each other, just the same as I had for him, and I felt that way about my wife; he was the companion, constant companion, of my wife and myself, too; he either came with his mother when she came to the shop, or was already there with me, but

she did not take him everywhere she went; I think she was devoted to the child, and of course he loved her, like any other child; he does not cry to see her. I keep the child with me on Avenue A; he has no relatives there in the house; as a rule I keep him with me down at the shop; I expect to continue keeping him with me, and put him in school, and when he is not in school he will be with me, wherever I am; I expect to keep him with me, and to put him in school here in Denton. * * *

"On the 24th day of December, I believe it was, there was a young lady or girl visiting my wife; prior to that time she had visited in my home, and the first time she was there she had come into my home, and I had told her to leave my home, and she had come back, and I told her to leave again; she had not been there very long; I had come in and found her there; she did not leave right then, it was some little time before she left; after I ordered her to leave, my wife grabbed my coat and threw it out in the yard; I told this girl, if she did not leave, I was going down and get the officers and have her locked up; I was talking to the girl, but they were both present, and she did not go, and I started then to dress and go to town, and this tie that was brought in, my brother sent me one and sent Emmett one just like it; I started to put that on, decided I would wear it, and my wife tried to get that tie, and I got my hat and put it on, and was trying to tie that tie; I was up before the glass, and in trying to cut that tie, get it off of me, I kept pushing her back like that (indicating with his hand). I did that two or three times, and she had hold of this tie with one hand, and when I pushed her back at last she lost her hold and fell on the floor. I did not knock her down or strike her; I did not hit her; she was trying to cut the tie, and I shoved her back, and she was saying I should not wear it. She would burn it up. She did nothing else, except kick and hit me with her fist on the shoulders; she tried to hit me in the face, but I did not pay any attention to it; after I did that, I went to town and stayed for an hour or hour and a half; when I got back, I found this girl was gone, and nobody else there."

Mrs. Hattie Price testified by deposition as follows:

"My name is Hattie Price. * * * I have known John A. McCrary for 20 years, and Mrs. Emma McCrary between 8 and 9 years; I knew her casually for about 4 years and the balance of the time, about 4 years, our acquaintance has been intimate. I received a letter on July 10, 1918, and I now have it here before me."

The letter identified by the witness as above was offered in evidence and is as follows:

"Dear Mrs. Price: I want you to help me; you know a friend in need is a friend indeed. I felt like I could trust you better with this than any one else. I want to go to Fort Worth to-morrow (Wednesday), and I am going to pretend to John that I am out at your house Wednesday evening and night, and I will be in Thursday. Would like for you to be in Thurs.

But see me first before you see him. I am pretending that you came Wed. to get me to go out to a big demonstration at May school Wed. evening, and that I am spending Wed. night with you also. You know I am going to leave on the 10:52, go by the way of Dallas, and so I won't be here at noon. I am pretending that we left before dinner, so we could get back out to May school by 1 o'clock. If you come in Wed. night, shy of all the McCrarys. I want them to think we started back early, and Price, if he phones out there, or comes out there to see about me, make up a big one about my going off with one of the girls somewhere out around there, and that I will be back after a bit. Help me this time, and anything I can do to repay you let me know. Fannie Mae will explain to you about my going, if she sees you before I do, or I will explain when I see you.

"Don't fail me.          Emma."

The witness further testified:

"There was no canning club meeting at May's schoolhouse at the time mentioned in that letter, and Mrs. McCrary did not come to my house at the time mentioned in it, and she did not stay all night at my house at that time. * * * I talked to her with reference to her trip away from home. She told me that she went to Fort Worth to visit a friend, and that she did not want Mr. McCrary to know where she had been, and she asked me not to tell him or anybody that she had been there, and not to tell him or anybody about it. She said: 'Price, you can save me; the boy has lied to a finish for me. He made his daddy believe we was at your house.' She said that the boy had told his father that they had been to your house and had eaten watermelon, and had been on the river fishing. She said that McCrary would not live with her, if he knew that she had deceived him and had been away. I went to her home at that time, because she had sent for me to come, and to find out why she had written me that letter.

"Mrs. McCrary said she went to Fort Worth on the train to visit a friend, but did not say at what time as I now remember it, or at what time she came back; that she came back by way of Dallas on the interurban, and from Dallas to Denton in a private car; she said she met Dee Price at the depot at Dallas, and that he was very drunk, and urged his attentions on her; that she dodged him and hired a car, and come home that way to avoid Dee Price; that he was very drunk and she was afraid of him. She said the car cost $15 or $16, I am not just sure which she said, and she did not say whose car it was; she did not say whether Dee Price gave her anything or not. * * *

"It is a fact that I have known John A. McCrary all his life, and was intimate with his father and mother in Ellis county. I am acquainted with both Emmett and Eugene McCrary. * * * I have seen John McCrary twice, and I sent for him both times; he has never been there with Emmett, and Eugene brought him in the car both times he has been here. I have not seen John McCrary, Sr., since John McCrary, Jr., separated from his wife; have not seen him this year. I have talked to John McCrary about this case, and

have made a written statement to Mr. Bob Hopkins, and I signed what Mr. Hopkins wrote. * * *

I did not have the letter in August, 1918, and so told Mr. Hopkins, but not under oath; I had given the letter to John McCrary, and presume he had it; it was in my possession until I sent for John McCrary to come and get it, and he has had it since that time until to-day; I do not usually preserve letters; this is the only one I remember now, but I usually receive one or two each week. * * * Outside of the first letter I got, I never knew of any other indiscretion on the part of Mrs. McCrary. I do not know anything else about the McCrary case. * * * I lived on Mrs. McCrary's place. No one has promised to pay me or reward me in any way. I have not told Emma McCrary time and again that the McCrary family did not like her and were trying to get rid of her, and I made no such statement to her."

Mrs. Howard Bills testified by deposition on behalf of the plaintiff as follows:

"My name is Myrtle E. Bills, and I am 27 years of age; residence, 1006 Texas street, El Paso, Texas, where I have lived less than two weeks. * * * We lived in Denton, Texas, about five years, and about four years of that time we lived at 52 John B. Denton street. I just knew Mrs. Emma McCrary, the wife of John McCrary; I never was personally acquainted with her; they lived on Bolivar street, but I do not know the number. I never saw her with a young man. I do not know how many times I saw Mrs. McCrary in company with a soldier; sometimes they would sit on the high school steps, and that is about all I ever saw, and then they would walk down the street. We lived just the second house north of the high school; I could not see the high school from my porch, but I could from a swing I had in front. Sometimes, when she came down first, she would usually walk in front of my house, until the man came down, and she would meet him. I do not remember the dates; I know it was last summer and fall."

Cross-interrogatories:

"I just kept my own house in Denton, which I am doing here. I know John McCrary; the last time I saw him was when I passed in front of his shop in Denton, just a few days before I left. He was sitting in there with his wife. I never received any letters from him. There were three of the McCrary boys, but I do not know them. I knew John McCrary, because he lived there close to us, just three blocks away. I never received any letters from E. E. McCrary. I did not tell any one about seeing Mrs. McCrary with this fellow, except my sister-in-law. I never had a conversation with John McCrary in my life; I just knew him. I have no interest in this case."

Mr. Garrett Wells, a witness called by plaintiff, testified as follows:

"My name is Garrett Wells, and I have lived in Denton a little over 8 years. Am acquainted with John McCrary and his wife, Mrs. Emma

McCrary. I heard of their separation about May 14, 1919. I was not living here then, but was prior to that time. I know Dee Price. Last spring, during the Red Cross drive, I saw Mrs. McCrary and Dee Price together around on the square, meeting and talking, and once I saw them get in a car down here below the post office about 3 o'clock in the afternoon and drive north on Locust street. * * *"

Cross-examination:

"I do not remember the date when they got in the car there, but it was along in the spring some time. They were going north on Locust street, and if they continued to drive in that direction, and went far enough, they would have to pass Dee Price's home, where his wife and daughter lived. I do not know how far they did go, nor what time they got back. I think Mrs. McCrary helped in the Red Cross drive, and that Dee Price was chairman of it."

Redirect examination:

"I guess Dee Price had a wife and grown daughter on the 14th day of May of the year, if they haven't died."

Mr. Dave Keating, a witness called by the plaintiff, testified as follows:

"My name is Dave Keating. I lived in Denton about 18 months, and was personally acquainted with John McCrary and Emma McCrary; lived in the same house about 17 months with them. We had no children but, but John McCrary and his wife had a little boy. During the time we lived in the same house together, John McCrary treated his wife just as fine as any man could, in my opinion; I never saw any thing wrong on his part, but she would spat at him at times; she would get mad at him, and be puffed up two or three days; fly off, you know; couldn't get along for two or three days at a time. I have heard him complain at her about using too much false hair, spending too much for clothes and the boy's things, that were unnecessary and using too much paint and things. John and I had a potato patch together; John was to furnish the seed, and I was to work it. I planted the potatoes, and they came up and got about large enough to eat, and one afternoon I took a half dozen, or something like that, and after they were cooked invited John and his wife to come in and eat part of them, and she pulled up the vines and threw them over the fence."

Cross-examination:

"I live at 3431 Ada street, Fort Worth. I was summoned as a witness last night; I told John McCrary some time ago that I would come whenever the case was tried. I am paying my own expenses up here, and no one is paying me a cent to testify. I volunteered to come and testify. I said awhile ago that the differences John McCrary and his wife had down there didn't amount to anything. If you want my opinion, I think most every man has some little differences with his wife."

Miss Christine Fouts, a witness called by the plaintiff, testified as follows:

"My name is Christine Fouts, and I live in Denton. My father's name is W. T. Fouts, and I have lived here in Denton about 12 years, I think. I know Dee Price when I see him, and I know Emma McCrary when I see her; I have known her about 3 years, I think, and I have known Dee Price about 6 or 8 months. I have attended picture shows in Denton, and have seen Dee Price and Mrs. Emma McCrary together in a picture show; I don't remember the date, but about 3 or 4 months ago. It was within about a month of the separation, I think, in the afternoon, after school hours; this Poe girl was with me. We were sitting more than half way back, and Mrs. McCrary came in and sat down on the seat next to us, and Mr. Price came in and sat down next to her; we remained there about half an hour while they were sitting there together, just laughing and talking, while the show was going on. Mrs. McCrary came in alone, and no one was with Mr. Price when he came in. There were vacant seats other than the ones they occupied. I did not see them at the picture show on any other occasion. I do not remember which one of them left the show first. I do not remember whether there were plenty of seats vacant in the show that afternoon or not."

Mr. Oakley Skiles, a witness called by the plaintiff, testified as follows:

"My name is Oakley Skiles. I have been in Denton county about 25 years. I know Dee Price, and have known him a good while, 7 or 8 years, I think. I am acquainted with Emma McCrary, wife of John McCrary, and have known her 20 years, I guess. I have attended picture shows here, and saw Dee Price and Mrs. Emma McCrary together at a matinée at the Dreamland on the west side of the square some time in February or March of this year. I was in the back end of the house, and they were six or seven rows in front of me. I think Mrs. McCrary came in first; then I saw Dee Price come in, and he stood back on the east side at first, and then went and sat down by Mrs. McCrary. I do not recall whether there were other vacant seats or not. I do not think I have ever seen them together at the picture show again."

Cross-examination:

"I do not know whether Miss Christine Fouts was there that day or not, I might have seen her. The matinee used to begin at 2:30; I think it is changed to 2. I go to the picture show pretty often. I suppose that is the only occasion I ever saw Mrs. McCrary and Dee Price together; on this occasion she was in there, and he came and sat down by her; there were some vacant seats by me."

Mr. Dee Price, a witness called by the defendant, testified as follows:

"My name is Dee Price. I have lived in Denton county practically all my life; called this my home. I lived in West Texas 10 years. My family consists of a wife and three children, one married, one away from home; the daughter that lives at home will be 9 years of age in November. One of my daughters is married, and the other one is teaching school at Childress; she is 22 years old. My married daughter lives on Boulevard street here in Denton; before my daughter went to teach at Childress, about 2 months ago, she lived at my home. I am acquainted with Mrs. Emma McCrary; have known her some 10 years or 12 years. I know Mr. McCrary, and have known him some 10 years—something like that.

"I was in Mineral Wells about May 14th, and saw Mr. McCrary there, and I saw him where he and his wife were stopping at the hotel first. I was a stranger in Mineral Wells, and a party had told me there was some people from Denton there, and I asked the negro porter to ask who they were, and he told me 'McCrary.' I saw John McCrary, and had a few minutes' conversation with him, and he asked me where I was going, and I told him I had started to Breckenridge, and that it had rained, so I could not go, and I had just come up to see who they were. I did not know any one in Mineral Wells.

"I saw him again after that; I was sitting in front of the Crazy Hotel, and he and the little boy came along, and he said they were going to get the little boy something to eat. I told him I was there, and could not get out of town, and to come back and go driving over the town, and he said, 'All right.' I told him I would go down and get my car out, and I immediately went to the Post Office garage to get my car; after I had gotten the car out, I met Dr. Thompson, and I then went to McCrary's room to tell Mrs. McCrary I was going driving with Dr. Thompson. When I got there the door was closed, and I knocked on door, and she opened it, and asked me to come in, and I went inside the door, and then Mr. McCrary, her husband, came in.

"I do not think I had been in that room probably a minute, or a little longer, when he came. I do not know whether the door was fastened or not when I went into that room. When McCrary came he knocked on the door, and Mrs. McCrary said, 'Wait a minute,' or something like that. She was standing back at the dresser arranging her hair, and she made some remark—she was not dressed, or something like that. She had on some common looking dress; I don't remember what color it was. I do not know whether or not the bed was made or unmade. I don't think I noticed the arrangements of the room, one way or the other; I noticed a bed in the room, but I do not know whether there was more than one or not. I don't remember how long I was in the room when McCrary came, though I just stepped in and was standing there near the door; when he came in, he proceeded to bawl her out, and I tried to talk to him. I don't remember the words he said, but he accused me of having improper relations, and I told him he was mistaken, there was nothing wrong; and I tried to talk to him, and he would not let me; said there was no use to talk, and I left the room. After I left the room, I waited and tried to talk to him, and explain to him what it was, and he said there was no use.

"I went back to the Crazy Hotel, and Mrs. McCrary came down there with her grip, and I talked to her and told her I was sorry that I came to her room, but that I did not have

any bad intentions at all; he was not with her then; she said she did not have any money, and I told her I would let her have some, and I gave her $20. I did not see McCrary any more at that time. I never saw Mrs. McCrary in any town or city outside of Denton and Mineral Wells that I remember of; I never saw her at Dallas or Fort Worth that I remember of. I know that I never talked to her in any town except Denton and Mineral Wells. There was never any immoral act or conversation took place between Mrs. McCrary and myself. I did all I could in the Red Cross Campaign here; was chairman of the Christmas Roll. I don't think Mrs. McCrary took any part in it, except she sold some tickets. I took part in it like the rest; did what I could to put it over, and tried to get others to help sell tickets. I think everybody did all they could.

"I never was in a car with Mrs. McCrary in my life; that is a lie, whoever told it. I have seen her at the picture show, and sat and talked to her twice, as well as I remember; I think at both of the picture shows here. There was no improper conversation between us in my life; I went to the picture show looking for my daughter; that was in the daytime; I never was at a picture show at night. I think probably there were vacant seats in the show; I saw her sitting there, and knew who she was, and sat down by her; I thought we were friends is all, and I personally do not know anything improper or immoral, and never did and never had any in mind; I never dreamed of such a thing; she was nothing but a girl to me; I had known her since she was a little girl. I never did make her any presents of any kind; never gave her any wine or whisky, or see her with any. I have never been in her house here in Denton; never knew where she lived. I have been to the house, and seen where it was.

"At the time Mrs. McCrary left for Mineral Wells, I did not have any conversation with her, and did not know that she contemplated the trip or was going to Mineral Wells. Mineral Wells is on the road from Denton to Breckenridge that I planned to go. It had rained so I could not get to that place; rained very hard all along. I am 49 years old, and was never a witness before in my life."

Cross-examination:

"If I ever saw Emma McCrary in any other town than Denton, I have no recollection of it. I certainly deny having met her in Dallas. I never gave her any whisky. I have had whisky and wine on the farm, but never kept it in the barn. I never saw Emma McCrary at the depot when she left for Mineral Wells. I am sure I have sat by her at the picture show twice, but I never saw her at any other place. * * *

"When I left John McCrary there [at their room] the first time, I went back to the Crazy Hotel and got me a paper, and was sitting there reading it when John McCrary came along with his little boy. I do not know that I asked him if he and his wife would like to go driving. I asked him if he would like to drive over the town. I might have mentioned his wife. I don't remember whether I said he and his wife, or not, or who; but I remember telling him I would take him and his little boy. I do not remember that he said he would be back in an hour and a half; but he did not tell me he had to get something to eat before they could go, but that they were going to take a bath.

"After he and the little boy left, I went to the Post Office garage to get my car out, and did get it out and parked it across the street, and paid my garage storage on the car and met Dr. Thompson. When I left the hotel and went to the garage, my car was pushed out, and I went down and looked over the car to see that it was all right, to see if it had plenty of gas and oil; it did not take me very long, and I then stepped across the street, which is a little wider than the average, to the garage, and when I got there I was right on the sidewalk that led up to the Post Office Hotel; I met Dr. Thompson there, and talked with him a couple of minutes. I then went on up to the Post Office Hotel, and when I got there I asked the lady if Mrs. McCrary was in her room. I did not ask if John McCrary was there; I knew he was not. I knew that when I started up there; that is why I went up there.

"I went up to the room and the door was closed. I do not know whether the room had been cleaned up or not; I never noticed, but I think it had. I noticed a bed in the corner of the room. I do not know whether her husband came while I was in there and took hold of the knob or not; he knocked on the door, someone did; I don't think it was the little boy, but after some knocking the door was opened, and when it was opened John McCrary said something like 'What does this mean?' I don't remember the words exactly, but he said, 'What in the hell are you doing in here with your breeches unbuttoned?' and my pants were unbuttoned, and then turned to his wife and said, 'I never thought you would turn out whoring around this way'—something like that; I think those were the words. I went on the outside of the door and tried to talk to John; he said there was nothing to talk about. He got his knife out, and his wife said for me to get away, he would kill me; something like that, I don't remember the words. She had on a dress, is all I know about how she was dressed. I do not know anything about her silk drawers lying on the bed, or her corset lying on a chair. I did not see what was on the bed; I never looked at it.

"I went up to that room to tell Mrs. McCrary that I was going driving with Dr. Thompson. I knew that her husband had told me he was going to take a bath. I never asked him what bath house he was going to. * * * I do not think I had been in that room a minute when McCrary came; probably a minute and a half. I do not know whether they had a telephone in that hotel or not; the porter might have phoned up there; I never told him to. When I got to the Post Office Hotel, I went up that small stairway in the hall; there might have been a small table or desk right at the foot of that stairway with a register on it. I did not look at any register; I asked the lady upstairs, and there was but one entrance. I do not know whether the rooms there are all upstairs or

not. I knew they were upstairs, and stopping there, because the porter told me. * * *

"I went there to tell her I was not going driving; that I was going with Dr. Thompson, and would have my car in the afternoon, and to talk it over with John. I had not given a thought to whether I would come back after I went with Dr. Thompson. I don't reckon she knew, when I went up there, I was going to take her out driving. She asked when I left Denton, and I told her that. I intended to come back after I met Dr. Thompson, I wanted to talk to him; I was going out with him, and then come back, and take them when I came back. * * * When I met Dr. Thompson, he asked me to go with him; he had a truck stuck in the mud; he is in the oil business, you know. I did not know how long I was going to be gone with him, and did not care. I did not go out with him; I came back and told him what had occurred, and that I did not care to go driving. It was not raining that day. I sometimes go out in my shirtsleeves, but usually wear a coat, and I have gone around town in my shirtsleeves. * * *

"I was standing there in that room with two or three buttons of my pants unfastened, but I did not know it until he called my attention to it; but when he said, 'What in the hell are you doing here with your breeches unbuttoned?' I knew what he thought, and I said there had been nothing wrong there; I had no bad intentions going into the room. I don't suppose I expressed myself at all as to how came my pants unbuttoned. I did not care about seeing the woman; only did it through courtesy, and I could have seen her in the reception hall, but I didn't think anything about it.

"I am 49 years old, and have a wife and daughters. I knew it was a suspicious circumstance to go into the room of another man's wife and shut the door; but just like any one else, who was a stranger, you wanted to talk, and they asked you inside, you would go. I did not have any private conversation for Mrs. McCrary; she just asked me to come to the room, and I went up there, and I never thought about going to the reception hall. I was in a hurry; Dr. Thompson was down there waiting for me to go driving with him."

Redirect examination:

"I had on a light worsted pair of pants, a little too small for me, and several people had seen me wearing them, and called my attention to the top buttons being unbuttoned. They were not unbuttoned all the way, had other buttons fastened. I did not unbutton my trousers when I got into that room."

Le Roy F. Thompson testified by deposition in behalf of the defendant as follows:

"My name is Le Roy F. Thompson; age 29; residence, Fort Worth; occupation, oil operator. I am acquainted with Dee Price; have known him approximately 6 years. I was in Mineral Wells on the 14th day of May this year, and met Dee Price there about 9 or 10 o'clock in the forenoon; I casually asked him to take a ride with me; he told me that he would be very glad to do so, but that he would have to go and break an engagement with some friends from his home town before he could accept;

I was one block west of the post office when I met him, and we walked towards the post office while we talked. He did not go immediately with me and get into the automobile and take a ride; I do not know where he did go. I judge it was between 2 and 5 minutes after he left me before I saw him again. I do not know where he had been; I never saw Dee Price drinking; but it is my opinion that he had been drinking. I can tell, when I am in conversation with a person, whether or not they have been drinking and it is my opinion that Price had been drinking.

"When I saw Price again, he appeared excited and worried; but he did not say anything that led me to believe that he had done anything wrong. I kept my car at the Post Office garage in Mineral Wells. Just east of the post office is the Post Office Hotel, about a half a block. I was in front of the Post Office garage when Dee Price left me the first time, about half a block from the Post Office Hotel. * * * I am not interested in this matter. * * * Should judge it is not over 100 yards from where Dee Price left me to the Post Office Hotel, and I should judge he was not gone over 5 minutes. I do not know the exact time, but am judging from what transpired in the meantime. * * *"

Mr. J. F. Johnson, a witness called by the defendant, testified as follows:

"My name is J. F. Johnson, and I live at 122 South Locust street, Denton, Texas; I was born and raised here, and lived here the biggest part of the time. I am a contractor. I am a brother-in-law of the defendant and John McCrary; I married the defendant's sister Maggie. My wife and I have no children. * * * I had heard of the affair at Mineral Wells, and I went and told him I was very sorry they were in trouble, and if there was anything to do to assist I would be glad to do it. I had heard her side of the case, and I had no hard feeling either way; explained my position as well as I could, and he seemed to understand all right, and talked something in regard to the case. I could not get much out of him. I asked him if the baby could come to see his mother; she was very sick and under the care of a physician. He said, 'No.' * * * I have made efforts on behalf of the child's mother for her to see the child, and he has not permitted her to see it, except on the street."

J. W. Pender, a witness called by defendant, testified as follows:

"My name is J. W. Pender. I am a teacher, and have been teaching for about 13 years at the Normal College. I am acquainted with Dee Price. I have noticed him several times with his trousers unbuttoned; up in the lodge room I called his attention to it, and one time on the streets some time last spring. The buttons, first or second buttons, and I called his attention to it; remarked to him one time that, if he wanted to stand on the streets, he had better arrange his trousers."

Mrs. Maggie Johnson, a witness called by the defendant, testified as follows:

"My name is Maggie Johnson. I was raised in Denton, Texas; have been married 8 years

last August. The first years of my life I spent in school here in Denton, and as soon as I graduated from the public school in Denton I went to the Normal, and after I secured a first grade certificate went back to teaching there, and taught for 4 years up until I married.

"The defendant, Mrs. McCrary, is my only sister. I saw the little child involved in this suit one day last week, I believe in front of McCrary's plumbing shop. I have had no conversation with him, but once, since May, and he never offered to speak to me. His mother has had no conversation with him since his father took him away. Just as far as the child could see me before his father took him away, he would call to me; his disposition towards his mother was very kind and loving and affectionate. I never saw a more affectionate child than he was, and I have often remarked how indulgent she was over him. I knew I loved him as much as I could love any one; she was very affectionate towards the child, and always kept him dressed very neatly, and oftentimes I would buy him little trinkets.

"Mrs. McCrary is now living with my mother and myself in my home, and I do not know of any person I would rather have live with me than that baby. Mrs. McCrary is my only sister, and she is welcome to everything I have. I was not present on the occasion of the intended Christmas tree for the little fellow that they did not have. I was not present at the fuss or quarrel between Mr. McCrary and Mrs. McCrary. I went there to the Christmas tree, and the child was there."

Nora Lee Womack testified on behalf of the defendant as follows:

"My name is Nora Lee Womack; age, eighteen; and I live in Oklahoma City, Oklahoma. I have resided in Denton, Texas. I know John A. McCrary and his wife, Emma McCrary. I have stopped at their home in Denton, Texas, and stayed all night there. I have witnessed a difficulty between John A. McCrary and his wife. I was there about 10 days, and right at first everything was all right until Christmas day. On Christmas day in 1916 he came in at noon with a gray necktie, and made a remark that it was a Christmas present, and handed it to Emma. I don't know whether it had the name on it, or whether he told her who gave it to him, and she told him he would not ever wear it. I think the name was on it, and she told him he would not ever wear it. He said he would, and went back to town and took it with him. Then, when he came back that night, he put it on, and when he started out they had an argument about whether he would wear it. I don't remember just what they said, and she tried to take it off of him. I think she got it off once, and he put it back on. They had a Christmas tree for John, Jr., and he was going to be Santa Claus; so Emma got the toys and gave them to him, after they had this argument, and he put the tie on and started out with John, Jr. She told him he could not go with him with that tie on, and tried to take John, Jr.; away from him, and he hit her; then they had a fight, and she tried to get it off him. I think she picked up some scissors from the dresser. Anyway, he took them away from her,

and cut her on the hand, and scratched her on the face, and knocked her down. John, Jr., was crying, and I started to take him in the other room, and John told me to put him down and keep my hands off him. I took him in the other room anyway. I started to help him, and he told me to go away and let him alone; it wasn't anything to me. So I took the boy and went out on the porch. Then he went down town. I had a date that night, and she asked me not to go—to stay there, and I stayed. I was asleep when he came back; that was on or about Christmas, 1916.

"On that occasion John McCrary simply fought and cursed his wife; I don't remember just what he did. I know it was a struggle. She was scratched all over, and places on her shoulder. He had her flat on her back on the floor. I do not remember the words they used, other than Emma said he would not wear the tie, and take Snooky down town, and wearing this tie that another woman had given him. What he got mad about was the fact that she gave him the toys after they had been fussing, and said to him, 'Come on with Daddy, and we will go down town,' and started out with him. I don't remember the exact words, just what they were.

"We lived across the street from them nearly two years, and he was just disagreeable most all the time; he fussed about everything. She would ask where he had been, and he would not tell her, and he would take John, Jr., off and stay until 10 or 11 o'clock, and Emma wouldn't know whether John, Jr., was with him or not, and would be gone until 10 or 11 o'clock, when he would bring him home. I know several times, when I was over there, he would get mad about something, and cuss Emma and I both out about anything, and I wouldn't even know what it would be about. Emma said once that he told everybody down town that his bills and her bills were separate; if they wanted to credit her that was their lookout, he was not paying them. That was in the fall of 1915."

Mr. W. D. Hollars, a witness called by the defendant, testified as follows:

"My name is W. D. Hollars, and I live in Texas. I have lived in Denton 12 years. I am a cement finisher. I am acquainted with Mr. and Mrs. McCrary; I suppose I have known them about 9 or 10 years. I have lived in the same house with them. I am married, and was at that time. I suppose I lived in the same house with them about 12 or 14 months; we lived in one part of the house, and they lived in another. I never saw any misconduct of any kind on the part of Mrs. Emma McCrary while we lived in the house with her. John McCrary's treatment of his wife seemed to be as well as you would expect."

Miss Annie Henry, a witness called by the defendant, testified as follows:

"My name is Annie Henry. I lived in Denton 15 years; at present I am living in Fort Worth. I know Mrs. Emma McCrary and her husband, John McCrary. I lived the last 2 years I was in Denton with Mrs. McCrary. I am single. My mother and sister lived with me; we were living in the same house with Mr. and Mrs McCrary from November, 1916, to

October, 1918. During the time we lived there I never saw one thing improper on the part of Mrs. McCrary; I never knew of but one disturbance she ever had with her husband, and that came up about a trip we took to the lake; myself, my sister, and Mrs. McCrary and others went out to Taylor's Lake to have a little picnic. I never saw that disturbance, but Mrs. McCrary was very much hurt over it; she was nervous and crying. My mother and the other parties who went upon that trip were with Mrs. McCrary all the time, and she did not receive any attention from any man on that trip."

Mrs. Emma McCrary, the defendant, testified in her own behalf as follows:

"My name is Emma McCrary. I am the wife of the plaintiff in this case, who has filed a suit for divorce against me, and I a cross-bill against him. I was born in Denton, Texas, and have lived here since. John McCrary and I were married June 11, 1911, at the home of J. M. McCrary, and separated May 14, 1919, at Mineral Wells, Texas. We have one child, a boy, six years old his next birthday, named John A. McCrary, Jr.

"I know Dee Price, and have known him for 12 or 15 years. I have never been with Dee Price in an automobile in Denton or any other town in my life. I have sat by him at the picture show, I believe, as many as three times; sat by him one time at the Princess. I will say I have sat by him three times, and I have sat by other men in Denton. There has been no improper relations between me and Dee Price, or any other man, only as a friend.

"Upon the occasion in question at Mineral Wells, I did not know Dee Price was in town; no one had called me up to say he wanted to find me. I never talked with him over the phone, or wrote him a letter, and never received a letter from him, in my life. The first time I learned he was in Mineral Wells was May 14, 1919, Wednesday morning, about 9:15 in the morning. McCrary had gotten up; there had been an electrical storm, and it was a cold, damp morning, and I asked him what time it was, and he said it was about 9 o'clock, and we had been up about 10 or 15 minutes when we heard a knock on the door, and some one says, 'There is some one to see you people.' It was Mrs. Jackson, the chambermaid. When she knocked, McCrary said, 'Wait a minute.' We were both up, then, and Price was out in the hall. They said, 'Good morning,' and McCrary turned and asked him into the room, and I says, 'No, the room has not been straightened up yet.' At that particular time I was engaged in dressing my baby. Dee Price did not come in at that time. I replied that the room was torn up. I had just gotten the union suit on my baby, and laid his clothes out and washed his face, and was fixing to put on the remainder of his clothes.

"The baby remained with me in the room, and Price and McCrary was out in the hall; I do not know what other conversation they had. McCrary went out of the room and was gone about 10 or 15 minutes, and when he returned started to the lavatory and took the baby with him. When he left with the baby to take his bath, he left me a dollar. After he left, I took the water pitcher to the bath room, and drew some water, and washed some for the baby, and while I was washing there was another knock at the door, and it was Mr. Price. I had on a house dress, underclothes, slippers, and hose; I have the identical apron I had on that morning.

"This place where we were stopping was dilapidated; there was a little hook or latch on the door; there was no lock, or the knob was gone, and the latch did not hold if you fastened it, and you had to shut the door and put something against it; it would fly open, and would not stay shut with the customary way of closing; that was the way my husband and I fastened it to keep it closed. At night we fastened it with the hook; if there was ever a key in the door, no way to lock the door with a key. That door was fastened as usual when Price came.

"When I opened the door, and saw who it was, I stepped back, and, after I had, Mr. Price says, 'Mrs. McCrary,' made some remark about coming, and I made some remark about coming into the room, and I closed the door and asked him to have a chair; he said he had come to tell me that he had met McCrary and talked to him, and made arrangements to go for a car drive, going driving, and in the meantime he had run across a friend who had asked him to go driving with him, and that it would interfere with his going with McCrary, and as he did he stepped inside the door, and I walked across the room about one-third of the way, and got a hairpin from the dresser, and was fixing my hair, and just as Price said those few words, I heard a knock on the door; I was in front of the dresser at the time, and I said, 'Those are my folks,' and I walked across from the dresser and opened the door, and stepped back, and McCrary entered the room.

"McCrary says, 'What does this mean, you two in this room together?' and I was shocked and grieved, and did not know what to say, and Mr. Price says, 'It don't mean anything;' and he cursed him and says, 'Get out of here.' The door was open, and he was standing in the room. McCrary wouldn't let him explain why he was there, wouldn't listen to any explanation, and he said something about his clothes being disarranged, and then he got out his knife and says, 'Get out of here, or I will kill you,' drew his knife on Price, and Price got out of the room; he was trying to explain to McCrary, and I told Price I would rather he would leave the room; 'Don't explain to him anything;' and McCrary says, 'You get out, too; if you don't leave the room, too, I will kill both of you.' He closed the door after that; I do not know whether he fastened it or not.

"I do not know where the said entrance or stairway is. The shades were up; had not been pulled down that morning. After I got out in the hall, I was weak and nervous, couldn't hardly stand, and I sat down on the edge of a chair just outside the door about 25 or 30 minutes, and did not attempt to go back into the room then. I went back after McCrary was gone.

"At the time Price came into the room the garments mentioned heretofore were in a hand bag in the room under the edge of the bed, and when I came back into that room the contents were dumped on the bed. I made the piece of

underwear mentioned out of an old silk skirt I had worn two years; my mother assisted me the first time, and I had made it over. I judge the garments you show me are the ones. That is the only pair I ever owned, and I made it out of an old skirt I had worn two years.

"Mr. Price had not been in that room when my husband came more than a minute and a half or two; I never cleaned the room up or made the beds until afternoon; the beds had not been made in the room that morning at either time when Price was there; the real excuse for not admitting Price in the room the first time he was there was that I was dressing my baby.

"My corset was not on the bed; it was on a chair, where I had thrown it the night before; I had not had it on that morning. That is the same clothing I had on that morning when Price was there; that was my customary way of dressing around the house with my underwear on. When I went back into the room after my husband was gone, and found the things scattered around, I gathered them up and put them in the hand bag and left it in the hall. The dollar he had given me was not in the room. I did not have any money, and I took the hand bag and went to the lobby of the Crazy Hotel and saw Price, and Mr. Price said he was very sorry; expressed his regrets, and said he had tried to talk and reason' with McCrary, and he would not let him—would not let him give him any explanation. I told Mr. Price he had left me out there without money to get home, and Mr. Price reached in his pocket and took out $20 and handed it to me. I have still got it.

"After I left the Crazy Hotel I went to the station at Mineral Wells, and while I was there in the station the proprietor of the hotel came down there and said, 'Mrs. McCrary, some lawyers had sent word to the hotel, where he made a deposit in the bank,' and I went to the bank and took charge of it; it amounted to $5, and I came home on that. Since then I have not received 5 cents from McCrary, and he has not offered a nickel towards supporting me. * * * I have not been able to see or talk with my baby since May 14th. I received notice of this suit on July 11th. I have had no communication with my husband since May 14th, nor has he undertook or endeavored to communicate with me, or sought any explanation, so far as I know.

"During the summer of 1918, about July 10th, I believe it was—just a short time before I had asked my husband to let me take a trip to Dallas or Fort Worth to visit some friends, and asked him to go to the Keatings with me, and he told me I could go—I left Denton on the noon train, and went to Dallas, and stopped at the St. George, and registered under my own name. I reached there at 1 or 2 o'clock in the afternoon, and went to the St. George and registered, and went to the room, and then spent the afternoon just walking around town and to two moving picture shows, I believe, and returned to the hotel about 7:30 or 8 o'clock, and went to the room and changed clothes. I took a lunch of cake and sandwiches with me when I started on that trip. After I ate my lunch, I went down in the lobby of the hotel; I never left it any more that afternoon.

"I left the hotel for Fort Worth next morning on the 3 o'clock Interurban, which is the first one out, and sat in the station at Fort Worth until the train left for Denton; as near as I can recall, the train left about 8 o'clock, and I got to Denton about 9 or 10 o'clock in the morning. I did not visit the Keatings; I had already notified them I was not coming because—McCrary had previously agreed that I could go—that is the trip about which I wrote the letter to Mrs. Price. At the hotel the mosquitoes were so bad that I left the room at 12:30 and came down in the lobby, and stayed there and talked to the night clerk, who informed me when the next car would go to Fort Worth. The next train did not leave Dallas until some time next afternoon, and I could get home much sooner by taking the Interurban than to wait in Dallas for the train.

"I did not meet or see Dee Price in Dallas, and I have never seen him in any town other than Denton and Mineral Wells. * * * I made up my mind in the hotel lobby at Dallas that I would come back home, and when I got home the little boy was sick; he was 5½ years old then, and was a child of average intelligence for that age. I did not have him make any statement to his father when we got back home. * * * My object in writing to Mrs. Price was that McCrary wanted to back out, and would not let me go, and I determined to go anyway. * * *

"During the summer of 1917 Mrs. Samuels and myself planned to go to Taylor Lake and have dinner and prepared lunch, and John refused to go, and when I came back that night McCrary was indignant and angry, and accused me of letting men teach me to swim, so they could put their hands on me. No man had been teaching me to swim.

"About the necktie incident, a package came with a card, with no name on it, and when McCrary came to supper I gave him the package, and he said he didn't know who, and I said, 'Some woman,' and told him I did not want him to wear it, and he put it on, and I tried to take it off of him, and he knocked me down and cut my hand on the scissors. I secured the scissors and tried to cut the tie, and he cut my hand and scratched me about the neck with his finger nail, and tried to choke me. Miss Womack stayed there that night; she slept by herself in the room adjoining our bedroom. The child was present during this fight. My husband and I had some difficulty prior to the birth of this child; we had been married about a year and a half before I knew I was to become a mother.

"I have never had immoral relations with any man, and have never conceived the idea to have. I never had anything to do with any man other than John McCrary. I never met any man about dusk, or any other time, at the schoolhouse. McCrary did not have any regular hour to come to supper; usually came about 7 or 8—about sundown or dusk. The high school is about two or three blocks from our house. I have only seen Mrs. Bills on the street. I read her deposition. I never did meet any man and sit on the high school steps and talk to him.

"I have done housework. Am a graduate of the high school and gone to the Normal and C. I. A. one summer. After my graduation I married the plaintiff. I went to Sunday school almost every Sunday before my marriage. My

mother and sister are religiously inclined, members of the Christian church, the same church of which I am a member; and up until the 14th day of May I attended Sunday school and church. My husband has never been a member of any church in Denton. I am willing and able to maintain myself and this child and educate him. I do not care anything about the property; all I want is my baby. * * *

"I was asked in my deposition where I stayed that night, and did not answer it; I said I preferred to answer the question in the courthouse was one reason, and I knew that a man like McCrary was likely to do anything, and I did not care to answer it. I knew if I answered it he would have a chance to look up, and maybe buy some witnesses, if he could, and I did not tell how I came home. * * *

"Dee Price came to our room at Mineral Wells that morning about 9:10 or 9:15; we had been out of bed about 15 minutes. * * * Price had nothing to do with the locking of the door; I hooked it with this hook and opened it myself. My health was bad at the time I went to Mineral Wells. * * * After I got home from that trip, I was sick in bed for 10 or 12 days. * * *

"When McCrary left that morning I expected to take a bath myself; he left to take a bath and took the little boy; at that time I had on my apron, underclothes, and slippers. During this time he had been gone, I had gone to the bathroom and washed some things, when I heard the knock. When Dee Price came into that room, I never thought about the closing of the door; I had known him always, and I kept it closed.

"I have not asked for any credit; my husband had cut that off before, and I got credit for myself."

Mr. B. F. Kelsey, a witness called by the defendant, testified as follows:

"My name is B. F. Kelsey, and I have lived in Denton county 37 years. I am a traveling salesman. I know Dee Price, and have known him about 12 years. Along in the early spring of this year I met him, and remember the date, it was May 16th of this year. I noticed his pants with two buttons unfastened, the second and third from the top, and I called his attention to it, and we talked I guess 15 or 20 minutes, and I noticed them unbuttoned again, and called his attention to it again. I have seen him on another occasion with his pants unbuttoned, and called his attention to it; it was over in front of my house, and I was sitting in my car; I have seen him with his pants unfastened those three times, and I am positive I have seen him once, right close to the American Exchange Bank, with the same pants.

"I saw the two buttons next to the top unfastened. It did not excite my suspicion any. He was not locked up in a room with another man's wife. I got acquainted with him 12 years ago, and we are good friends. He had on a light suit, the same he had each time. I do not know whether he had on a belt or not. His vest covered the top button, but not the second, and just two of the buttons were unbuttoned. That was all after this occurrence at Mineral Wells. I had not heard about it until he stopped me in the road and told me; that

was the first time I noticed his pants and he told me about his breeches. I have no animosity against McCrary; we are good friends."

Mr. W. N. Swinney, a witness called by the defendant, testified as follows:

"My name is W. N. Swinney, and I am city marshal of Denton. I have no interest in this case. Mrs. McCrary called for me, and I went one morning after this trouble at Mineral Wells. I did not see her child down there. She wanted me to find out whether or not the child was in town. I was an officer at that time; she was in bed at that time. I did not see the child for several days; I never reported to her anything about it. I have been an officer here two years. I have never seen anything improper in Mrs. McCrary's conduct."

Mr. W. T. Johnson, a witness called by the defendant, testified as follows:

"My name is W. T. Johnson. I am at the St. George Hotel, at Dallas. On July 10th of last year I was room and cashier and handled the mail. As clerk, I see where each room is on the register. I identify these sheets as a record of the register for July 10th, which includes everybody who registered here on July 10th. One of these sheets shows the registrations of July 9th. The name Mrs. McCrary, of Denton, appearing on that sheet, is in my figures; but I do not remember about her registering. I was the day clerk. The transfer sheet here shows she just stayed during the day; it is a straight day rate, and shows that she checked out before 8 o'clock that night; otherwise she would have been charged a full rate. * * * It is a fact those sheets, two sheets, contain the names of all the people who registered there that day. It is opened up between 6 and 7 in the morning, and then they are registered as they come along. Mrs. McCrary's name is the eighth line from the top. I do not know what time she checked out, but the figures show she was there only a day."

The defendant rests.

Miss Marion Poe, a witness, called in rebuttal, testified as follows on behalf of the plaintiff:

"My name is Marion Poe, and I live at 110 Cleveland avenue, Denton, Texas. I was raised in Denton; am the daughter of Miles Poe. I am acquainted with Mrs. McCrary, and I know Dee Price. I have seen them together at moving picture shows; I don't think more than three times. I saw them at the Dreamland over on the west side; Mrs. McCrary was there when I came in; she was standing against the wall, or sitting against the wall, and Mr. Price came in and sat down by her on the other side, put his coat on the other seat and sat down by her very close; they seemed to be very much interested in each other; he was holding her hand, which attracted my attention, and I just quit looking at the picture show and began watching the hand show. The next time I saw them at the same show, and I noticed them, because I had seen the other occurrence. Mrs. McCrary was already in the show, and Price come in and stood back until the show was about half done, and then came

and sat down by her. I could not see them well; the other time they were in front of me; the other time I saw them they were together when I came in, about four seats from the back of the house. I observed them. I am not related to the parties.

"I do not attend any school. I quit last year in June. I know the McCrarys and have known them four or five years. Miss Fouts was with me when I saw them at the picture show. We were behind Mrs. McCrary when this scene took place, directly behind on the next seats. I suppose Miss Fouts could have seen them playing hands. I guess that was about February. I think Price had on an overcoat. I believe she had a cloak, but am not certain. The seats there have oval-shaped backs of solid wood. We were sitting behind them, and they were sitting side by side; I saw them playing hands. The young lady with me was next to the wall, and we were the two seats directly behind them; I did not have to stand up to see that; I could see over the back of the seats. I do not know what school Mrs. McCrary's sister taught at before she was married; it was not the school I was suspended from. The picture show seats are curved, and I could see the occurrence I mentioned."

J. L. Smith, a witness for plaintiff, in rebuttal, testified as follows:

"My name is J. L. Smith, and I live in Denton. I have lived here about 45 years. Am a carpenter. I am acquainted with John McCrary and his wife, Emma McCrary. I have known McCrary for quite a while. I don't know just how long, and I have known Emma McCrary all her life. I have seen Mrs. McCrary with a soldier on Pearl street in the north part of town. I had quit work and gone home, and was out cutting grass in front of my house, when she came to the corner there and waited a little while, and directly this soldier came, and they went right up to the North Side school building, and that was the last I saw of them; this was a little after dark; it was dark. There were lights on the street; it was nighttime, and it was dark, except for the street lights. I was as close to her as I am to counsel (indicating 6 to 10 feet). I did not pay any attention to how she was dressed. I do not think I saw any cloak. I do not know what time of the year it was. It was a little over a year ago, while the boys were coming from Fort Worth up here, so many of them. This man was in uniform. He had no overcoat. Mrs. McCrary did not have on a veil. I do not know whether Mrs. McCrary had on a hat or not. I did not pay attention to that. * * * I do not know what month it was in; could not say positive. I know it was the first time I cut my grass; it might have been the latter part of March or first part of April. I had my supper and come out and was cutting my grass after dark. I could see how to cut grass all right. * * * Mrs. McCrary came from the west, as did the soldier; they did not come along together. I did not speak to her. There were two lots between me and her, where she stopped, and then she came right along in front of me and went up to the schoolhouse; they were talking as they came along, but I did not know what about; I do not know how long they stayed at the schoolhouse; I did not see them any more, before or since. I don't think, in my best judgment, she had on a hat. I live 200 or 300 yards from the schoolhouse. I saw them all the way, going along."

Mr. J. F. Sternberger, a witness for plaintiff, in rebuttal, testified as follows:

"My name is J. F. Sternberger. I live on McKinney street, in Denton; have lived in Denton county 27 years. I am a carpenter and 75 years old. I am acquainted with John A. McCrary, and know his wife when I see her. I saw an occurrence at McCrary's house about Christmas; I could not specify the date or time exactly. I was walking along one evening on the sidewalk, and Mrs. McCrary came running out on the porch with a coat, and threw it out, and went back in the house; the curtains were up and light shining, and I saw McCrary standing in front of the glass, fixing his collar or something, and she was tugging or pulling at him, and he turned around and sort of shoved or pushed her, and got back to the mirror, and she kept coming back, and he shoved her off two or three times; she was hitting or hitting at him; I could not see anything in her hands; the last time he pushed her off, her feet slipped and she fell down; that is all I saw, except she got up and went out of the room."

Marion Henry, a witness for plaintiff, in rebuttal, testified as follows:

"My name is Marion Henry. I was raised in Denton county, and have been back here about 10 years; went off, and came back. I am acquainted with John McCrary and his wife; have lived in the same house with them. I could not be positive of the time I saw a racket between them, but Mr. Sternberger came up while it was there. I was eating there at the time, and staying at the fire hall. I had finished eating and started to town, when I saw Mrs. McCrary come to the door, and when she came back John grabbed her; I thought she was just playing with him. When she went back, she grabbed hold of him, and struck him in the back; he was standing before the mirror, working with his collar or tie, and he shoved her back away from him; I stood there a minute, and she ran and grabbed hold of him again, and he shoved her back four or five times, I reckon; finally, when he shoved her, the best I could see, I was standing at the window, her heel caught in the carpet and she fell; then she got up and took the baby and went into the other room. If he struck her, or choked her, or hit her, or done anything to hurt her, I did not see it."

John McCrary testified as follows:

"Eugene, my brother, gave me that necktie. I went back and examined the door to room No. 10 at Mineral Wells, and it was apparently in the same condition that it was the 14th day of May, just a plain pine door, with an ordinary lock, and when you pushed it to, the latch would catch, just like any other door, and when I went back I examined to see if there had been any changes in the lock; it would catch with the latch like any other door, and when you wanted to open it you would turn the knob half way around. The hook on the inside was just like

the hook and eye on a screen door, and could not be fastened unless the door was entirely shut; there was nothing wrong about the door. In addition to this hook and eye, there was a thumb bolt and a lock and key on the door. When I took hold of the door and pushed it, it did not give any. I could not tell how it was fastened.

"I have spoken to the child about his treatment of his mother since that time, and asked him why he didn't speak, and he said he did not want to; I have never said anything to him to cause him not to desire to speak to her. The photographs shown are photographs of this boy. I said that he did not wish to speak to his mother. I have had him with me at all times since the separation, and I have not taught him to treat his mother and aunt that way. He did not talk to his mother in Fort Worth, or want to go back to her. He has never asked for his mama or aunt. I have never carried the child to see its mother, or carried him where she could see him, except on the streets."

[5] To the person who has taken the trouble to carefully read and consider the foregoing testimony, as it has been our duty to do, we think it apparent that the verdict below has for its main support the testimony of the appellee. In the old Mosaic law the crime of murder was forbidden and made punishable by death, but it was expressly declared in that connection that one witness was not sufficient to cause the death penalty. See Numbers, 35:30, and Deuteronomy, 17:6. A decree which may result in worse than death ought not, therefore, to be permitted to rest upon the testimony of appellee alone. It is insisted, however, that his testimony is corroborated. Let us examine the testimony a little more in detail, and determine, of we can, the force that should be given by a court to the testimony of the appellee and to the circumstances relied upon in corroboration. In considering this testimony, we wish to apply the rule that may be said to apply in every criminal case; that is, that that construction of the evidence most favorable to the accused should be adopted, if reasonable and probable.

What weight, then, shall be given to the circumstances as detailed by appellee? He says that from the time Dee Price left him in front of the Crazy Hotel until he reached his room it was from 20 to 40 minutes; he detailed what he did in the meantime, which, when considered in connection with the testimony of Dee Price and Dr. Thompson, makes it more probable that this time did not exceed 20 minutes, for the testimony shows that the Crazy Hotel is something over four blocks from the hotel at which appellee and his wife were stopping. Dee Price testified without contradiction that he proceeded from the Crazy Hotel to the garage where his auto was parked, and there examined it to see whether it was supplied with oil and gas, and returned and met his friend, Dr. Thompson. Some little time may be reasonably allowed for the usual greetings and conversation that occurred. Dr. Thompson then invited him to take an auto ride, which was agreed to, with the accompanying statement that he (Price) must first go and inform his friends that he would be unable to fulfill the engagement that he had made with appellee. He then proceeded to the room of appellee and his wife, in order to inform the appellant of his change in purpose. Price further testified that he had not been in the room more than about 2 minutes when appellee appeared upon the scene. All of this can be very reasonably said to have occupied 20 minutes. In this connection, to relieve from suspicion the fact that Price went to the appellant, rather than to the appellee, it is to be remembered that when Price left the appellee in front of the Crazy Hotel the latter stated that he was going to take his bath. Price then could reasonably have thought that there would be some difficulty in returning from the point of his conversation with Dr. Thompson—some four blocks—and in getting in communication with appellee.

[6] Dr. Thompson, whose credibility as a witness is not attacked by a shred of testimony in this case, testified explicitly that from the time Dee Price departed in order to notify the appellant of his change in purpose until he returned it did not exceed 5 minutes; in one place in the testimony he states 2 to 5 minutes. Dr. Thompson further testified that upon the return of Dee Price he was much agitated; that he declared that he had been falsely accused, and desired Dr. Thompson to go to the appellee and seek an opportunity of explanation which had been denied him. These statements were res gestæ, and as such admissible as original evidence and entitled to consideration; and it may be said that the truth of these statements is by no means improbable when considered with all other testimony. Appellee testified that, upon his arrival at his room, his little boy knocked upon the door, and that it was a minute or two before the door was opened; but nothing is said as to the force of the knock, or loudness of the tone of voice on the part of the little boy when he exclaimed, "Mama, we want in." It cannot be affirmed with certainty that Dee Price and the appellant at first heard the voice; this only is to be inferred. Appellee says that he walked around and found the window blinds down. This was especially denied by appellant—oath against oath; one or the other of the parties may have been mistaken. Appellant and appellee had not yet taken breakfast. Appellee had left his wife for his bath with the little boy, evidently for the reason that she was not prepared to go, and whether the blinds had been

pulled and left down is not made to appear. If appellant was in her room dressing, preparatory to taking her breakfast and bath, it is not improbable that the blinds in fact were down. If they were, the fact by no means proves adultery upon the part of the wife. It is but a circumstance affording a possible suspicion. When appellee returned from his examination of the windows and obtained admittance in the room, he refused any explanation on the part of his wife or of Dee Price, excited by the fact, as he testified, that Dee Price's trousers were unbuttoned. Just how many of these buttons were unfastened is not made to appear, and while the circumstances may justify his suspicion, it yet does not certainly show that in fact the crime charged had been committed, especially in view of other evidence on the part of at least two witnesses to the effect that Dee Price had on other occasions been noticed with his trousers unfastened.

Appellee further says that his wife was "pretending" to fix her hair. That it was pretense is, of course, a mere inference. The fact is that she was arranging her hair; she so testified, and testified that she was so engaged at the time Dee Price knocked, all of which is by no means improbable. Appellee further states that he found the door locked. In regard to this the appellant testified that the door was not in the usual order of doors; that, in order for it to remain closed, it was necessary that it be latched. As to this appellee contradicted her—oath against oath. But it is worthy of notice that appellee in his testimony states that after his return to Denton he made a trip to Mineral Wells, and then examined the door and found it to be in the usual condition, without evidence of change. It would therefore seem that he was not very certain in his recollection of the condition of the door at first, and it is to be observed that on the trial he made no effort to corroborate his testimony in this respect, by introducing the proprietress of the hotel, who could have most certainly testified as to the fastening of the door of the hotel at the time of Dee Price's entry.

The Master said on one occasion, in substance, that "whosoever looketh on a woman to lust after her hath committed adultery with her already in his heart." But it is not in this sense that our statutes make adultery ground for divorce. It is hardly to be supposed that our Legislature had any such purpose in its enactment. To authorize a decree on this ground the adultery must be one in fact, and not in the ecclesiastical sense. If, therefore, it be admitted that Dee Price upon his entry into the room entertained the purpose imputed to him, it yet of itself fails to show that the purpose was accomplished. It could scarcely have been accomplished within the two minutes that he was in the room, and his purpose, if

any such there was, yet fails to show that appellant entertained the same purpose. Many a woman has doubtless been subjected to the forced attention of a man, which, if made public, without explanation, would blast her name. And it would seem that, if the appellee had permitted himself to visualize even in a small degree the misery of his wife and son that would follow the course he took, he would have had pity enough in his heart to have listened to the explanation his wife sought to make before he thrust her out and locked the door.

Appellee and his able counsel must have thought that corroboration of appellee's testimony was necessary to justify the decree; at least, corroboration was attempted. It was shown that on two or three occasions Dee Price and appellant were seen to sit together in a picture show. It was not stated to have been late at night, but was presumably in the daytime; on each occasion they came in and departed separately; on neither occasion does it appear from any evidence that the appellant invited Dee Price to take the seat by her, and on neither occasion, except one, is any circumstance detailed upon which any suspicion can be based, and that is that one of the little girls states that she saw them "playing hands" together. Her companion, who was with her, as will be seen from her testimony, makes no mention of this, and the one who observed it is the girl who denied that she had been "expelled" from the school taught by appellant's sister.

Another circumstance is that one of the witnesses states that he saw them riding together in an auto. He says, however, that they were driving up the street, evidently in broad daylight. He does not pretend to know how long they had been together, where they were going, or when appellant got out of the car. It is to be remembered that the period was in wartime, and Dee Price was chairman of the Red Cross drive, and appellant was a worker, and it may very reasonably have happened, as this witness stated, without any evil purpose whatever. Appellant denied that she had ever ridden in the auto with Dee Price—the circumstance was doubtless of such little consequence as to have entirely escaped her recollection. Appellee also introduced a witness or so who testified that they had seen appellant with some soldiers. It was not shown, however, that these meetings were in the dark, or that they were prearranged, or for improper purposes. We all know how the heart of the American people went out to our soldier boys during the preparation for overseas service, and certainly adultery ought not to be imputed to the woman who may have been seen greeting them or talking with them.

Appellee also offered the testimony of a Mrs. Price, who must evidently have thought that appellant was worthy of her association,

for the evidence shows that they were intimate friends. This woman sent for the appellee and volunteered the information furnished in the letter offered in evidence. This letter, however, contains no confession of guilt of adultery. It is a mere request on appellant's part to deceive her husband. She explains this by stating that she had desired to visit some friends living in Fort Worth, who, the evidence shows, had formerly lived in the same house with appellee and his wife; that her husband had refused to consent to her making the trip, and she was afraid of him, if he should learn the fact that the trip had been made without his consent. Whatever may be said in condemnation of such a request, appellant's explanation is not unreasonable. It nowhere appears that her trip to Dallas and back home by way of Fort Worth was by prearrangement to meet Dee Price in Dallas. The clerk of the hotel at that point exhibited the register of the day, and it shows that she registered in her own name, and fails to show that Dee Price registered. The clerk's register shows that appellant did not remain all night, which would have been most probable, had the trip been made by prearrangement between Dee Price and appellant. She testified, for reasons given, that she remained in the office of the hotel for an early train to Fort Worth, when she concluded to return home. The Mrs. Price who furnished appellee with the letter referred to also testified that on one occasion appellant informed her that on the Dallas trip she saw Dee Price, but that she had nothing whatever to do with him. There is certainly no proof that they were together in an unlawful way while in Dallas or Fort Worth.

[7] Further criticism or analysis of the evidence might perhaps be justly made, but the length to which this opinion has already extended admonishes me that I must hasten to a close. In concluding this branch of the subject, I wish, however, to say that I think the corroboration of appellee's testimony is wholly lacking in sufficient probative force. The corroborating circumstances relied upon, as I view them, are for the most part childish and gossipy, and have no place in cold reason as against the good name of any woman. One of our great readers of the human heart wrote that "trifles, light as air, are to the jealous confirmations strong as proofs of Holy Writ." That appellee was disposed to be jealous is proven by the testimony to the effect that, upon a return of appellant and others from an outing, appellee so demeaned himself as to cause his wife to cry, accusing her of permitting men to teach her how to swim. The witness states that the charge was baseless, and there is no evidence whatever to show that it was true. To appellee, therefore, whose mind was inflamed with jealousy, and who found it in

his heart to brand the wife of his youth and the mother of his son as an adulteress, and thus condemn her to perpetual distress and ignominy, and brand his innocent offspring with her shame, the evidence in this case may be deemed full and sufficient; but to my mind it is not so. On the contrary, I think it is wanting in that degree of cogency necessary to a conviction of a crime.

[8] In criminal trials the defendant is presumed to be innocent until his guilt is established beyond a reasonable doubt, and our statute in divorce cases already referred to substantially imposes a like rule. Appellant appears before us, not only clothed with the presumption of innocence, but one or more witnesses, who had long lived in the same house with appellant and her husband, testified that they had never seen any wrong or improper thing done by her. If we therefore apply the rule referred to in criminal cases, and indulge the presumption of innocence, to which every woman is entitled, the majority think that appellant should be adjudged not guilty. The circumstances relied upon as establishing her guilt, which have been satisfactorily proven, when freed from mere suspicion and all inconclusive inferences, amount merely to indiscretions or faults not beyond forgiveness. The majority can only feel that the evidence in support of the decree is not "full and satisfactory." This requirement of the statute, as said by Judge Fly, of the San Antonio Court of Appeals, in the case of Lohmuller v. Lohmuller, 135 S. W. 753—

"should be jealously enforced by the courts of the country, and there should be more caution and scrutiny of the facts and circumstances in this day of 'affinities,' when the barriers of the common law have been destroyed, and husband and wife have been given unbridled license in testifying against each other in cases of divorce."

In illustration of the strictness with which the rule is enforced, we will refer to but two of our cases. The first is that of Burney v. Burney, 11 Tex. Civ. App. 174, 32 S. W. 328. In that case, as in this, the husband instituted a divorce based on the grounds of adultery and cruel treatment. The court there said:

"As to the ground of adultery, the evidence, at most, raises only a suspicion of the fact. There were only two witnesses who testified upon this point. The substance of their testimony was to this effect: Ann Allen, a witness, went to the house of plaintiff and knocked on the door for admission, but was denied admission by the plaintiff. She was not satisfied, and walked around to the back of the house to see what was going on. She saw the plaintiff and a negro preacher named Morgan—plaintiff herself being a negro. Plaintiff and this man Morgan were in the parlor together when witness knocked on the door, and she was refused admission. She saw the preacher Morgan walk

(230 S.W.)

through plaintiff's bedroom and out on the porch, but did not see them together in the bedroom; there was no bed in the parlor, but a lounge or settee. At another time, when one Dick Winfrey, a deputy sheriff, went with a warrant to arrest the negro, Chas. Burney, he saw a man whom he thought was a negro preacher, and witness testified that he 'acted like he was at home.' There were no other persons present at the house but plaintiff and this man. This is all the testimony bearing upon the charge of adultery, and while it may be 'sufficient to arouse some suspicion as to the fidelity of the wife, it does not come up to that certainty of proof contemplated by the law as a basis for a decree of divorce. Rev. Stats. art. 2161, § 2; Travidio v. Travidio, 54 Tex. 261."

The other is the case of Trevino v. Trevino, by our Supreme Court, reported in 54 Tex. 261. The evidence was as follows:

"The marriage was proved. The witness, Ricardo Lucio, knew the parties, and testified that he knew also José Maria Leal, who was a peddler, who often visited Josefa, on the ranch, 'and treated her as his mistress.' In answer to a threat by witness that 'if he (Leal) did not act differently he would inform the plaintiff,' he was answered by Leal that 'she was kept by him—that it was all right, and to say nothing to plaintiff.' He said he 'acted with the woman as with a whore.' All this was objected to and excluded, except the declarations of Leal, which were permitted in evidence. This witness testified that Leal only came when the husband was absent, and that he saw them shut themselves up in the house together three times. Explaining what he meant by saying he observed undue familiarity, he said he saw Leal take hold of her once. Pecho Cortinas swore that he knew that defendant committed adultery with Leal, because he saw them shut themselves in a house with two rooms three or four times; was told that Leal would get into the bed where plaintiff and defendant were sleeping. One night he heard a pistol shot fired, and soon after saw Leal running away in his drawers. A sister of the defendant explained the pistol shot heard by Cortinas, by stating that Leal one night at a late hour was sitting on the side of her bed, there being no light, and believing there was no one else in the room, when he was suddenly flashed by the plaintiff, who seized him by the hair, and, on his breaking loose, fired at him."

In disposing of the case the court, among other things, said:

"The evidence upon which the judgment is based consists almost exclusively of mere inferences and conclusions of the witnesses from what they heard or were told, which they were improperly permitted to detail, or of circumstances which may have warranted suspicion, but which certainly constituted no sufficient proof of guilt."

And the judgment against the woman was reversed and the cause remanded. As it seems to the majority, the evidence in the case before us, to say the least of it, is not more satisfactory than in the case just cited, and we conclude that the judgment in this case, as in the cases referred to, should be reversed, and the cause remanded.

We know nothing of the parties or witnesses in this proceeding, except what is disclosed by the record, and the majority find nothing in the history of either Dee Price or the appellant, Mrs. McCrary, to compel the belief that their solemn assertions of innocence should be wholly disregarded, and appellee justified by a decree of this court in casting the first stone that drives his wife on a road that leads to only God knows where. On the contrary, the writer feels glad to say that he not only thinks the evidence is insufficient to establish the guilt of appellant, but it leads to the opposite and more satisfactory conclusion that she is not guilty of the charge made against her.

Therefore the majority conclude that the judgment should be reversed and cause remanded; and it is so ordered.

BUCK, J. (dissenting). I am of the opinion that the evidence of the facts charged in plaintiff's petition is sufficient, not only to satisfy the minds of the jury by a preponderance of the evidence, but is sufficient to satisfy the mind of the trial judge by full and satisfactory proof. Among the facts tending to show that defendant was guilty of adultery with Price are the following: Plaintiff testified that when he and his wife were at the depot at Denton, preparatory to going to Mineral Falls for a visit, and while he was purchasing the tickets, Dee Price came to where Mrs. McCrary was, and they talked together. The next time he saw Price was at the door of their room at the hotel. Price came up to the room, saying that he was en route to Breckenridge (or Ranger, both are given), and learned that the McCrarys were in Mineral Wells. McCrary asked his wife if he and Price could come into the room, and his wife said the room was not cleaned up. In a short time, McCrary and his little boy started to the bath house, and met Price on the street in front of one of the hotels, and Price asked if he and his wife would like to go riding with him. McCrary said they would, but it would be about an hour and a half before he would be ready. McCrary then went on to the bath house, but, on account of some misunderstanding, did not take a bath. They then went to the bakery and got some cakes, and the little boy began to want to go back to the room. Walking leisurely along, they reached the room and found the door locked. The little boy took hold of the knob and tried to open it, and could not do so; then he began to knock on the door; no reply. The plaintiff walked out on the porch on the east side and found the blinds to the window were pulled down. Then the two went back to the door and knocked, both calling for Mrs. McCrary

to let them in. Finally the door was opened by Dee Price. At this juncture, I will quote from plaintiff's testimony as follows:

"When Dee Price opened the door, he was standing there with his pants all unbuttoned, and my wife was sitting in front of the mirror with some false hair, pretending like she was pinning that on her head. The room was in a worse condition then than it was at the time she refused to let Dee Price in when I was present; her corset was on the back of a chair, and on the bed opposite mine lay her silk drawers. I had never seen those silk drawers before. When I got into the room and saw Dee Price in that condition, I hardly know what I did. I said, 'What does this mean?' and he said, 'It don't mean anything;' and I said, 'If it don't mean anything, what are you doing standing there with your pants unbuttoned?' And while he was making this talk he got back in the door with the door open; he had his hand on this door, holding it, and I said to my wife, 'I have always tried to respect you; I had no idea you would start whoring around this way;' and I run my hand back, and took out my knife and opened it, and started toward Price, and when I did that, she walked up and says, 'You stand there,' and then Price pulled the door to. When I got in there she had a loose apron slipped over her head. When I started towards Price, she then opened the door, and I told her to get out, and she got out; that is about all that happened, so far as I know; after she was outside, I locked the door."

Plaintiff testified that it was from one minute to two minutes after he and his little boy knocked at the door before he got in. Several witnesses testified to having seen Dee Price and the defendant sitting together at picture shows in Denton; one stating that, when she saw them, Price was holding defendant's hand. Other witnesses testified to having seen Mrs. McCrary meet a soldier at night several times, and then they would go off together towards the school grounds near by. Other witnesses testified to having seen Price take Mrs. McCrary in his car and drive off together. A Mrs. Price, not related to Dee Price, testified to having received from Mrs. McCrary a letter, in which the defendant said she was going to Fort Worth by way of Dallas to spend the night, and she wanted Mrs. Price to tell the plaintiff that she was out to the home of Mrs. Price at the time. Mrs. McCrary admitted that she wrote the letter, and that she spent the night in Dallas. Mrs. Price further testified that Mrs. McCrary had often boasted to her that "John [her husband] was easy to fool," and that she could "put over anything she wanted to on him."

Defendant denied any improper conduct with Dee Price or any other man. She stated that Dee Price had just come into the room to tell her that he had made arrangements to take a ride with a veterinary surgeon, and could not take her and family riding as he had agreed with plaintiff. She claimed that he had been in the room only a few minutes when her husband knocked, and nothing improper had occurred between them. She stated that the reason the door was locked was that it would not stay closed unless fastened by a hook inside. Plaintiff denied this, claiming that the door could be closed and held by the lock, in addition to the hook inside.

Several witnesses testified to have seen Dee Price at various times in Denton with his pants in front unbuttoned. Some of the times mentioned by these witnesses were after the occurrence at Mineral Wells, and some of the witnesses said it was "some time last spring." One witness testified that he remembered the date, May 16th. The occurrence at Mineral Wells was on May 14th. The jury and trial court were justified in concluding that Dee Price was showing himself around Denton, after the occurrence at Mineral Wells, with his pants unbuttoned, for the purpose of making evidence for himself.

No explanation is given by Mrs. McCrary of the trip to Dallas. It was not to visit the Keatings, for they lived in Fort Worth, and she says she had phoned them she was not coming. Nor is there any explanation of her meeting a soldier at various times in the evening, or at night (as testified by one witness), and their going off together towards the unoccupied schoolhouse. I do not think the rule applicable in criminal cases, that the guilt of the defendant must be established beyond a reasonable doubt, is applicable here. It is only that the evidence must be full and satisfactory to the unprejudiced mind of an impartial judge. In my opinion it is in this case.

Without quoting further from the evidence, and without further discussion, I am of the opinion that the evidence is sufficient to sustain the trial court's finding that the facts relied on by plaintiff had been established by full and satisfactory proof. As said by Lord Stowell in an early English case (Loveden v. Loveden, 2 Hag. Con. 2):

"It is not necessary to prove the direct facts of adultery; for, being committed in secret, it it seldom susceptible of proof, except by circumstances which, however, are sufficient whenever they would lead the guarded discretion of a reasonable and just man to a conclusion of guilt."

9 R. C. L. p. 329, after quoting the English case above, goes on to say:

"The courts must, perforce, take such evidence as the nature of the case permits—circumstantial, direct, or positive—and bring to bear upon it the experiences and observations of life, and thus weighing it with prudence and care give effect to its just preponderance."

## On Motion for Rehearing.

CONNER, C. J. [9] By both oral and written argument the motion for rehearing in this cause has been urged by counsel for appellee, and at the expense of being thought tedious we feel like adding that, as noted in the original opinion of the majority, the ground for divorce relied on by plaintiff was that on a certain date and in the town of Mineral Wells his wife was taken in adultery with Dee Price. By the provisions of article 4633 of our Statutes, the burden was upon him to sustain that charge by "full and satisfactory evidence." Mr. Webster defines the word "full" as follows:

"The highest state, point, or degree; complete measure; fullest or utmost extent; fullness."

In Greenleaf on Evidence, § 2, the following definition is given:

"By satisfactory evidence, which is sometimes called sufficient evidence, is intended that amount of proof which ordinarily satisfies an unprejudiced mind beyond reasonable doubt."

That definition was quoted with approval by this court in Moore v. Stone, 36 S. W. 909; and many decisions of this state, some of which are cited in that case, were substantially to the same effect. In Baines v. Ullmann, 71 Tex. 529, 9 S. W. 543, it was said:

"Evidence is said to satisfy the mind when it is such as frees the mind from doubt, suspense, or uncertainty."

The language used in article 4633, with respect to the quantum of proof required of plaintiff in order to obtain a divorce, was used in its legal significance, and imposes, substantially, the same burden as that imposed upon the state in a criminal prosecution to establish guilt by proof beyond a reasonable doubt. In enacting that statute, it is clear that the Legislature deemed the sanctity of the marriage relation, the interests of society and of the parties involved, of equal importance to that of insuring to an individual his freedom from punishment until his guilt is established beyond a reasonable doubt. And why not? By express provisions of article 6826, Paschal's Digest, the ground for a divorce could not be established by the testimony of either party. That statute remained in force until the year 1897, when it was amended by article 4633, Revised Statutes, so as to allow either party to testify. In the case of Stafford v. Stafford, 41 Tex. 117, which was decided under the old statute, the following was said:

"The marriage contract or relation, while classed in its legal acceptation as a civil contract between the parties to it, 'yet it is said to be more than a contract, and to differ from all other contracts,' and has interests and le-

gal consequences connected with and resulting from it that make it the most important to society of all human transactions. Its importance is fully appreciated by all civilized nations. *,* * While 'the suit for a divorce is in its form a civil proceeding, it has widely different features and incidents connected with it. In all divorce suits the defendant is charged with a breach of a solemn contract; in many cases, with disgraceful and brutal conduct; in others, with offenses that are known to the law either as a misdemeanor or felony. Again, no judgment of divorce can be rendered by agreement or consent; none by confession or admission of either party; neither can a judgment be rendered by default, and, as in criminal cases, the defendant cannot be compelled to criminate himself by answering or testifying under oath. These facts show that it is in its nature a quasi criminal proceeding, although not presented in the name of the state, nor punished by fine or imprisonment. To allow the husband and wife to give evidence in their divorce suit would not only loosen, weaken, and most injuriously affect the marriage tie, but would greatly tend to destroy or impair that unreserved confidence which exists between husband and wife, and which the wisdom of centuries has sought to preserve by preventing them from testifying against each other (save a limited exception)."

To sustain his charge that his wife was taken in adultery with Dee Price at the time and place alleged, plaintiff relied upon circumstantial evidence alone. The circumstances testified to by himself as taking place at that time and place, while of a suspicious tendency, fall far short of full proof of the charge alleged, even though it be accepted at its face value, and as unaffected by the testimony of defendant and Dee Price, contradicting it. The circumstances testified to by witnesses for plaintiff, and introduced to show that defendant had committed adultery prior to the occasion in controversy, even if taken at their full face value and unaffected by any testimony offered in rebuttal thereof by defendant, likewise fall far short of proof of adultery. The most that could be said of those circumstances would be that they tended to raise a suspicion that adultery might have been committed. Those circumstances were relied on by plaintiff to show that his wife was unchaste, and thus to add probative force to the circumstances testified to by himself. A mere inference founded upon such suspicious circumstances could add little probative force to mere circumstances testified to by plaintiff and relied on to support the further inference of guilt at the time and place alleged.

The foregoing observations are made with respect, solely, to the testimony introduced by plaintiff, without regard to that offered by the defendant, which cannot, in fairness, be wholly ignored. In the first place, both defendant and Dee Price flatly denied guilt of the charge made, although they frankly admitted certain facts, which, if unexplain-

ed, were of a suspicious character, and which they could have denied, if they had been inclined to do so. If it be said that their testimony was entitled to little weight, because of self-interest, it may be replied that the testimony of plaintiff himself shows that he entertains very strong feelings of revenge towards the defendant, and it is a matter of common knowledge that such a feeling is as strong an incentive to fabricate testimony as is the impulse of protection of one's own character. In the second place, Dr. Thompson was a disinterested witness, and for that reason his testimony is entitled to at least as much, if not more, weight than that of plaintiff, and according to his testimony, taken in connection with that of plaintiff himself, defendant and Dee Price did not have sufficient time to accomplish the offense charged, even though it should be conceded that they intended so to do; and even their intention, if any, to commit the act, would not be sufficient to sustain the charge alleged.

[10] We should, perhaps, notice an objection to our statement that it was not shown that appellant met a soldier "in the dark." The statement in our original opinion to this effect was not intended to be misleading, as is apparent from an examination of the testimony of the witness who so stated, to wit, the testimony of J. L. Smith, for we set out the testimony on the subject by the witness in full. It will be seen by a review of the testimony of the witness referred to that it was light enough for him to be mowing grass in his yard, to see that appellant was not wearing a veil or other disguise; that the soldier was not wearing an overcoat; that the parties did not come along together; that he saw the parties all the way going to the schoolhouse, "some 200 or 300 yards," after which time he saw the parties no more. We therefore think the inaccuracy referred to cannot be misleading.

[11] We are also asked to certify this case to the Supreme Court, but the majority do not deem it advisable to do so. By reference to article 1521 of our Revised Statutes, defining the jurisdiction of our Supreme Court, it will be seen that that court has been given jurisdiction over questions of law only. Articles 1590, 1591, V. S. Stats.; Warren v. City of Dennison, 89 Tex. 557, 36 S. W. 404. Article 1590 reads:

"The judgments of the Courts of Civil Appeals shall be conclusive in all cases on the facts of the case."

And article 1591, in so far as pertinent, reads:

"The judgments of the Courts of Civil Appeals shall be conclusive on the law and fact, * * * in the following cases: * * * (4) All cases of divorce."

And in the case of Warren v. City of Dennison, supra, the material issue was whether or not the city had been guilty of negligence, and the court said:

"Whether or not there was any evidence tending to show that it was negligence was a question of law. Whether or not, admitting there was some evidence of negligence, the evidence, taken all together, was such as to warrant the finding of the jury, is a question of fact."

Of like effect, we think, is the case of G., C. & S. F. Ry. Co. v. Riordan, 166 S. W. 133, of which the Supreme Court refused to take jurisdiction. Moreover, we think it a matter of very grave importance to the parties in this case that the issue between them shall be determined as speedily as may be done with due observance of their legal rights, and we have every reason to know that a certification of this case to the Supreme Court would result in a long delay.

We accordingly conclude that both the motion for rehearing and to certify should be overruled.

DUNKLIN, J., concurring; but BUCK, J., dissenting as to motion for rehearing.