## BURT v. BURT.   (No. 8418.)

(Court of Civil Appeals of Texas. Galveston. Dec. 20, 1923. Rehearing Denied March 20, 1924.)

**1. Pleading ⬅=34(3)—On general demurrer, petition entitled to benefit of every reasonable intendment.**

On general demurrer, petition in suit for divorce is entitled to benefit of every reasonable intendment.

**2. Divorce ⬅=27(3)—Petition for cruelty need not allege physical violence or fear of it.**

Petition in suit for divorce on ground of cruel treatment, under R. S. art. 4631, subd. 1, need not allege physical violence or fear of it.

Pleasants, C. J., dissenting on motion for rehearing.

Appeal from District Court, Harris County; J. D. Harvey, Judge.

Suit by C. P. Burt against Adele R. Burt. Judgment for plaintiff, and defendant appeals. Affirmed.

Love, Wagner & Wagner, of Houston, Adrian F. Levy, of Galveston, and Wm. M. Nathan, of Houston, for appellant.

Marsene Johnson, Elmo Johnson, Roy Johnson, and Marsene Johnson, Jr., all of Galveston, and Dave D. Hughes, of Houston, for appellee.

GRAVES, J. This is an appeal by the wife from a judgment of the court below granting her husband a divorce from her on the ground of cruel treatment, pursuant to R. S. art. 4631, subd. 1, providing for a divorce—

"Where either the husband or wife is guilty of excesses, cruel treatment or outrages toward the other, if such ill treatment is of such a nature as to render their living together insupportable."

There were no children of the marriage, no community property, and in support of the appeal only two contentions are made: First, that appellant's general demurrer to the petition of plaintiff below should have been sustained; and, second, that the evidence was insufficient to sustain the fact findings and to support the legal conclusion based thereon of the trial court.

The trial below was before the court without a jury, and fourteen detailed findings of fact with a conclusion of law appended, to the effect that the facts so found constituted in law such cruel treatment as justified the divorce, were filed.

[1] After an examination of the plaintiff's petition, in the light of our statutes and the decisions of our courts affecting the subject. We are unable to agree with appellant that her general demurrer to it was good. As

against such an attack it is, of course, entitled to the benefit of every reasonable intendment, and, when construed under that requirement, it is, in our opinion, so clearly sufficient that it is not thought necessary to enter into an extended discussion of the matter.

Appellant's main objection to the petition seems to be that it never alleged physical violence on the part of the wife toward the husband, nor the fear of it, nor even that the acts complained of were reasonably calculated to produce such degree of mental distress as would impair his health; the further objection being that the injury to him was not sufficiently charged.

[2] It is quite true that the petition does not allege physical violence or the fear of it, but we do not understand that to be the requirement in this state. As far back as 3 Tex. 79, in the case of Sheffield v. Sheffield, our Supreme Court, in discussing this question said:

"It cannot be doubted that a series of studied vexations, and deliberate insults and provocations, would, under our statute, be sufficient cause for divorce, without apprehension of personal violence, or bodily hurt. This would constitute the intolerable treatment contemplated by the statute."

To the same effect, under even more direct and positive pronouncements, are the holdings of our courts in Wright v. Wright, 6 Tex. at page 19; Eastman v. Eastman, 75 Tex. 473, 12 S. W. 1107; Dawson v. Dawson, 63 Tex. Civ. App. 168, 132 S. W. at page 381; Jones v. Jones, 60 Tex. 451; Golding v. Golding (Tex. Civ. App.) 108 S. W. at page 498; Bahn v. Bahn, 62 Tex. 518, 50 Am. Rep. 539; Speer on Marital Rights in Texas, at pages 671 and 672; Le Fevre v. Le Fevre (Tex. Civ. App.) 205 S. W. 842.

In the case of Golding v. Golding, supra, the court used this language:

"It is peculiarly a question for the court or jury to determine, after hearing the facts, whether or not, considering the appellant's temperament and condition, and in fact all the circumstances, appellee's treatment is of such a nature as to render their living together insupportable."

A like declaration is made in the Bahn Case just cited. In the petition here involved the plaintiff set out in much detail the facts relied upon as constituting the cruel treatment, and then, under different groups of them, concluded with the further averment that defendant "so conducted herself as to greatly insult and humiliate this plaintiff and cause him much mental suffering and distress," followed by a general charge applicable to all of the allegations, "that the conduct of the defendant as recited herein is in law such cruelty as renders the further living

⬅=For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

together of the parties wholly impossible and insupportable."

Upon the other question raised, we deem it unnecessary to undertake to here review, and thus perpetuate in the legal records of the state, the evidence which led the trial court to grant the divorce. We have very carefully examined the statement of facts and have listened to and read the arguments in behalf of both parties, and conclude that the evidence is sufficient to support enough of the material findings made to justify the granting of the divorce. In 'some few unessential particulars there is no supporting testimony; for instance, of that part of the fifth finding reciting that the defendant "would at times, without cause, attack plaintiff with sharp scissors and any other instruments which happened to be near at hand."

There is also, as appellant so pointedly argues, in reference to a number of the acts of the defendant, which the court found to have been committed with a certain purpose or intent upon her part, a lack of direct testimony as to the existence of such intent or purpose; but in all of these instances we have examined the record carefully and find such settings, such attending facts and circumstances, as, in our opinion, made the court's findings as to the intent or purpose with which the various acts were done legitimate inferences from what was in actual evidence. These objections, therefore, are not well taken.

Further discussion is deemed unnecessary. Under a realization that our judgment in this cause is final, we have taken pains to give it that care that its importance merits, and have reached the conclusion that we would not be justified in reversing the action of the trial court.

An affirmance must accordingly be ordered. Affirmed.

PLEASANTS, C. J., not sitting.

On Motion for Rehearing.

PER CURIAM. Rehearing denied.

PLEASANTS, C. J. (dissenting). I was not present when this case was decided, and did not participate in the consultation by my associates which resulted in the affirmance of the judgment. I have, however, in considering appellant's motion for a rehearing, carefully examined the record and from this examination feel constrained to earnestly dissent from the conclusion of the majority of this court that the judgment of the trial court should be affirmed. I agree with the conclusion of the majority that the trial court did not err in overruling defendant's general demurrer to the petition.

As stated in the majority opinion, the grounds upon which appellee seeks a divorce from his wife are "excesses, cruel treatment, and outrages" on her part "of such a nature as to render their living together insupportable." No one of the various wrongful acts charged against appellant in the petition is pleaded as sufficient in itself to entitle appellee to a divorce, but after reciting these acts in detail, the petition alleges that such conduct on the part of appellant greatly insulted and humiliated the appellee and caused him much suffering and distress, and was "in law such cruelty as renders the further living together of the parties wholly impossible and insupportable."

In my opinion none of the serious charges of misconduct by appellant made in the petition is sustained by satisfactory or sufficient evidence.

If, however, all these charges had been established by satisfactory evidence, they would not have entitled appellee to a divorce, because, under the undisputed evidence, and by his admission repeatedly made in letters written to appellant and not repudiated or explained in his testimony, appellant's mistreatment of him was provoked by his misconduct and ill treatment of her.

The evidence shows that the parties were married in the state of Pennsylvania on December 19, 1906, and lived together as husband and wife until their first separation in January, 1918. They returned to each other after a few months, but only remained together a short time, and separated finally on July 18, 1918. At the time of his marriage appellee was an officer in the United States navy. He was placed on the retired list of naval officers on June 30, 1913, and still holds that position in the navy. No children have been born as fruit of the marriage.

Appellee testifies, in substance, that appellant is a woman of violent temper, and during the first year of their married life she began to display her temper, and that on two occasions during that year she became angry with him for some cause (not stated) and went to the telephone in their home in Harrisburg, Pa., and put in a long distance call for a man in New York whom she had known before she married appellee, and that, in order to prevent her from talking to this man, he had to cut the telephone wires in his home. This is the only instance of misconduct that he charges her with during the first year of their married life, and thereafter everything went along very smoothly, and they got along well together for several years. The next misconduct of appellant testified to by appellee occurred in 1916, while they were living in an apartment house in Philadelphia. He says that during the one year they occupied the apartment Mrs. Burt on a number of occasions would lose her temper and abuse him in every way she could think of. He then narrates this circumstance:

"We had a servant who occupied the servant's bedroom in the rear of the apartment, and one night I was sitting reading the paper

in the living room of the apartment, she got up and without any apparent cause, she went into the bedroom. I heard her door close and then I heard the lock being turned. I got up from where I was sitting, went into my bedroom and looked into the drawer of my chiffonier where I kept my revolver. The revolver was gone. I tried the door of the other bedroom and found that it was locked. I then went and tried the other door from that bedroom which led into the hallway and found that was locked. I called out to her but received no reply, but in a few moments I heard a pistol shot. I went to the servant's bedroom in the rear. The servant was an Irish woman named Susan Clements. I called to her to come with me because it was possible Mrs. Burt had shot herself. Susan went with me and again I tried the door. It was still locked, but in a few moments the door was opened from the inside, she unlocked it, and she was standing there apparently in a dazed sort of condition. The bed was on fire; it had been set on fire by the discharge of the revolver, and it was apparent from the course of the bullet that she had kneeled by the side of that bed and pulled the trigger of the revolver, the bullet had gone through a small pillow which was lying against the foot of the bed and into a mirror of a bureau and had imbedded itself in the wall. Well, I beat the fire out and told Susan to put her to bed. The result of that was that I had to stay up all night and watch her, I did not know what she was going to do. The only explanation Mrs. Burt ever offered was—I had told her that I kept an empty chamber under the hammer of the Colt's gun, and it is dangerous to leave a cartridge under one of those navy Colt's, if you drop it it will be discharged by striking the hammer—I had told her I had left an empty chamber under the hammer, and she said she thought if she pulled it once it would not fire, but I have never had any explanation as to why she took the gun and locked herself in her room and pulled the trigger."

The next year, on April 1, 1917, they moved to a house in the suburbs of Philadelphia. Appellee had been, because of the war, placed on the active service, and was stationed first at Cramp's Shipyards, then at the Philadelphia Navy Yard. He says that his duties at the navy yard sometimes kept him later than the regular closing hour, 4:30 p. m., and that whenever he was later getting home than 5:15 p. m. appellant would meet him at the door and berate him for being late and want to know where he had been. He says that on one occasion, while living at this place, he returned from the navy yard, took off his uniform and put on civilian clothes, and went out to do some work in his garden. In a short time he was called in to dinner and during the meal his wife told him that she wanted to take a young lady who was visiting them to a matinee in the city the next afternoon, that he volunteered to go to the city and get the tickets for the matinee. and that he went for those tickets without changing his civilian clothes for his uniform; that he left home at 7:59, got in the

city at 8:15, and after buying the tickets he met a friend from the navy yard and they had two drinks. He got back home a few minutes after 10 o'clock. Upon his arrival at home his wife began to berate him and talked to him in such an outrageous manner that their young lady visitor told her that she thought it was perfectly outrageous for a wife to abuse her husband in that way, and that she had never seen a husband treat his wife with more consideration than appellee did. Appellant and the young lady then became angry with each other and the young lady left the next day When asked to repeat the language used by appellant on this occasion, he says:

"She asked me whether I had had anything to drink, and I told her the circumstances under which I had taken the two drinks I had had. She then accused me of drunkenness. 'You are drunk now, was the way she would talk to me. 'You have no right to go in and take a drink. You know you are a naval officer. You know you ought to be in uniform. You went in civilian clothes just for the purpose of getting a drink, you know you did.' That was her general attitude, on many occasions she has called me to my face a 'drunken beast.' I don't remember what the language was she used, but that was her attitude towards me."

In November, 1917, they took another apartment in Philadelphia and, according to appellee's testimony, during their residence in this apartment appellant "continued the same tactics of abuse which she had followed for many months." He then says that on several occasions she became angry with him and "would go to a window, generally in her night clothes, put one leg over the window sill and threaten to throw herself out onto a stone court below, three flights down, and I would have to go and drag her back in the room and tell her to stop her foolishness and behave herself."

He next says that in January, 1918, he took his wife to dinner at a restaurant and that over his protest she ordered and drank a number of cocktails, became drunk, took her diamond rings from her fingers and threw them on the floor; that in taking her home he had to support her as they went along the street and when they reached their apartment, in order to open the door, he had to withdraw his support and when he did so she fell down the steps leading up to the door in the presence of several persons who were passing along the street; that she could not stand alone and he had to pick her up, carry her up three flights of steps, and put her to bed.

Another incident testified to by appellant which occurred prior to the separation is, in substance, that on one occasion he and a friend, Jack Richards, started with appellant and two young ladies on a trip from Germantown to Atlantic City, and shortly after leaving Germantown appellant became enraged

and in the language of the witness "cussed us all out."

The foregoing is the substance of all of the testimony showing misconduct on the part of the appellant prior to her separation from appellee in July, 1918.

Appellant, in her testimony given on the trial, denied that she was ever intoxicated and categorically denied the statements of appellee as to her becoming intoxicated in a restaurant, throwing her jewelry upon the floor, and falling down the steps of her home, as testified by appellee. She also explained the discharge of the pistol in her room as purely accidental, and expressly denied that she ever pretended that she was going to throw herself from the window of her apartment, as testified by appellee. She fully and, if her testimony is to be believed, satisfactorily explained all of the occurrences told of by appellee in such manner as to relieve them of any seemingly unprovoked mistreatment of him. She says:

"The only criticism I ever made of Mr. Burt's actions was his drinking, the things he did, places he went, and the treatment he gave me at that time. * * * While he was not drinking he was a kind and loving husband, but when he drank he was everything that he should not be."

She testifies to a number of instances in which he came home intoxicated and was harsh and unkind in his treatment of her. She further testified:

"Mr. Burt told me that at a certain time when he was going to Washington on a business trip that Miss ——, who was the stenographer in the employ of the government in his department of the navy yard, had said she would like to go along, and he said, 'I took her with me. I had been drinking. I did not know what I was doing. I took her with me, and we stayed at the Raleigh Hotel and registered as man and wife,' and I said to him, 'And in uniform you did a thing like that,' and he said, 'Yes; I did.' I had conversations with Mr. Burt in the presence of this Miss ——, or with Miss —— in his presence. It was about October, 1917, that I saw Miss —— at his sister's house with Mr. Burt. He went with me there to this house, and I said, 'Miss ——, Mr. Burt confesses to me you and he have been maintaining an intimate relation.' I said, 'I cannot permit you to stay in my husband's office at the navy yard under those conditions, you must leave his office,' and she cried and said she would leave. I said, 'You went to Washington with him,' and she said 'Yes,' and I said, 'And stayed with him as his wife,' and she said 'Yes,' and I said, 'I don't intend to give up my husband, and I don't intend to leave him, and I think drink has made him do this,' and she said, 'Mrs. Burt, I will leave.' The next morning she came to my house. Mr. Burt was present. She came to my house above 7 o'clock, at Narveth. She came into the house. We were having breakfast, and the servant went to the door and she stood in the hall, as Mr. Burt and I went out in the hall, and she said, 'I came out to tell you if you make me leave Mr. Burt's office, I am going to have him prosecuted under the Mann White Slave Act. I have consulted a lawyer and he tells me that is what I can do."

According to appellant's testimony the relation between her and appellee became so strained and disagreeable in January, 1918, that, at appellee's request, she wrote the following instrument which was dictated and signed by appellee:

"Powelton, Apts. Phila.

"At my request my wife, Adele R. Burt, has written out this agreement made between us and which I now sign of my own free will and without coercion. It is my suggestion in which my wife now concurs that we separate for the reason that I demand more liberty regarding my movements than I have and my wife objects to my indulging in any form of alcoholic drink. I therefore agree to relinquish any and all claims that I may now have on furniture, silverware, bric-a-brac, etc., in favor of my wife. The said goods are contained in our apartment at the Powelton Ave. Phila. Apt. E 5. I promise to continue to completion the monthly payments on furniture and rugs purchased at Sterms, Market St., below 8th St. I further promise to pay annually the premium on life insurance of ten thousand dollars taken out by me in the Prudential Life Ins. Co. in favor of my wife and to make her the sole beneficiary. I agree to divide my income with my wife or in other words to pay her half of my income. This money to be sent to her promptly on the 15th and 30th of every month. In the event of my income being increased either in the navy or from outside sources, I will increase my wife's allowance accordingly.

"January 24, 1918.          C. P. Burt."

After the execution of this agreement Mr. Burt went to live in New York, but she and appellee corresponded frequently with each other. The nature of this correspondence and the character of the letters written by each is indicated by the following extracts from letters written her by appellee.

On February 21, 1918, he writes:

"My dear wife: Your letter was quite the finest thing I have ever read and I have read it many, many times. It has helped me greatly at a time when I needed all the help I could get. I am fighting my fight and the battle is a hard one, but with your help I will win. I have had a chance to indulge in introspection and I know that I have done nearly everything that I should not have done, that I have treated you shamefully, and that the causes have been, not of your making, but drink and the unrest and discontent which my indulgence in drink has created. I have not had a happy moment since you left. It took two days for me to begin to realize what I had done. Saturday night I had sense enough to go to a Turkish bath and begin the cleaning up process. I had to work Sunday. I have been improving daily since then and, although I have not stopped the drink entirely, I feel that in another week I will conquer the desire and quit the beastly stuff for all time. When I know that I have won I will tell you and you can then feel free to do as your judgment dictates.

* * * I am letting the women alone. You need not worry about that part of it. Write to me often. Your letters will help."

On March 28, 1918, he writes:

"My dear Adele: I received your letter written Saturday and the one written Monday. I do not blame you for writing the former (except the part about women, which is not true). I know that your faith was rudely shattered, and I do not expect, now, that you will recover it readily. It was there, I think, that I made a big mistake; in expecting you to be the same after the discovery you made last fall as you were before. I made other mistakes as well but this was an unreasonable expectation. I can tell you now, Adele that I am deeply and truly sorry for all that has happened and I am hoping that we can be to each other once more what we were before all this occurred. I am recovering my mental balance. I was crazy and I think I know the cause. Since I have stopped drinking my vision is clearer and all I ask now is to be allowed to atone for the misery I have caused a loving and true woman who deserved none of it."

On April 5, 1918, he writes:

"I do not expect you to forget the miserable past but I hope you can accept for the future a man who has seen the error of his ways and who is anxious for his own sake as well as for yours to do the right thing, to be right and to live right."

A number of letters passed between the parties during the spring of 1918, and appellant, relying upon appellee's promises of reformation, returned to live with him in May, 1918, but they only remained together a short time before their relations again became disagreeable and they agreed to a final separation, and under the laws of Pennsylvania executed a separation agreement which contains the following provision:

"(3) The party of the first part agrees to pay to the party of the second part the sum of one hundred and eighty dollars ($180.00) per month during the term of this agreement, providing he shall remain in the active service of the United States, or in the event that his income shall equal the income he now receives, and in the event that he shall be placed upon the retired list or his income be reduced below its present amount, he agrees to pay unto the party of the second part the sum of one hundred and twenty-five dollars ($125.00) per month, provided his income is equal to two hundred and fifty dollars per month. The monthly payments provided in this paragraph shall be made in two equal installments on the 15th and last days of each month, and shall be paid to the party of the second part by sending the same to her at such address as she may indicate or to such person or persons as she may designate."

Shortly after this agreement was executed, the appellee was retired from active service, and since such retirement has received from the government only the sum of $250 per month. He has at times been employed in private business and received compensation therefor which materially increased his monthly earnings.

He and appellant continued to correspond after their final separation, and the general tone of the letters introduced in evidence indicate that their affection for each other continued for a year or more. It seems that appellee got in arrears with his remittances to appellant and she complained bitterly of this and got a lawyer to write to him in regard to the matter.

On December 13, 1919, he wrote her a letter in confirmation of an agreement made with her attorney, in which he says:

"I further agree to increase the allowance provided in our agreement of July 31st, 1918, to two hundred ($200.00) dollars per month, and to make such assignment of my pay to that amount as shall secure the payment thereof promptly in two equal installments, on the 15th and last days of each and every month, while I am employed in other capacity than that of retired United States naval officer. I will inquire at once into the nondelivery of my United States government war risk insurance policy, try to obtain the same, and then at once forward it to you."

After this time he changed his location several times, his letters came infrequently, and his remittances became irregular. He obtained employment in Galveston in December, 1920, and has lived in Galveston and Harris counties since that time.

Appellant complained to the Navy Department of his failure to comply with his contract, and the department in turn took the matter up with him and notified him that it was the desire of the department that he make proper provision for his wife.

There is a conflict in the testimony as to the number of times he failed to make remittances and as to the amount due appellant. The difference in the amount being largely due to appellant's claim of $200 per month, while appellee claims that he was only under obligation to pay $125 per month. The evidence shows, however, beyond question that appellee was in arrears with the remittances due appellant, and she was in need of money for her support on July 25, 1921, when she wrote him a very bitter letter demanding that he pay her in 24 hours $500 of the $1,000 which she claimed he then owed her. She charges him in this letter with being "yellow clear through" and having "shamefully and heartlessly treated his wife whose only offense had been loyalty to him." She also says in this letter:

"I know all your business associates in New York and Galveston and I am determined now to go the limit in bringing you to justice. You ought to know that the volume of written evidence in my possession regarding you no man or woman of worth can disregard. You deserted me for no reason at all except your passion for women and drink, as your own letters prove, and after you have ruined my life. I

have asked only that you give me money to live on, so that I won't be dependent on charity and I have now for months. I know now why you have tried to force me to divorce you. You are yellow clear through and I loath you. Every derogatory word you have uttered against me you will pay for.

"I am going to fight now for my rights. You once called me a poor soft fool because I forgave and tried to forget your disgraceful treatment of me for the sake of keeping our home together and maintaining a position of respectability for you in society, but you were determined to wreck our home and my happiness and you succeeded. * * *

"I demand that you support me. What you have termed ancient history is going to become very modern history unless you do. At the present time I have made no move to show your real character to the world. You know that you perjured yourself in the examination before the Naval Board by presenting to them a false receipt for a bill you had not paid. I wonder if business men would trust a man who did such a thing. All you mean to me now, as I said before, is my support. I have lived on charity and borrowed money for months. You are in arrears five months and a half in your payments to me. I want the money. I have got to have it and I intend to get it. I want the money for moving my furniture. · You have squandered and are now squandering money that belongs to me on other women.

"Do you want to keep your position? I am giving you every opportunity to do so. I have no desire for revenge and never did have. If I had wanted that, you would be serving a sentence in prison under the Mann White Slave Act and another for perjury. All I ask of you, in fact demand, is my support and the money you owe me paid at once. I don't want a driblet. I want and must have it all. If you are not an utterly irresponsible person you will realize that the best thing for you to do is to pay me the money you owe me and keep your position, until people find you out for themselves. I advise you to take this letter to your lawyer and get his opinion of what is best for you to do.     Adele R. Burt."

Notwithstanding the threats contained in this letter there is no evidence that appellant ever repeated to any person the charges against appellee made in the letter. She testified, "I have never done anything with the intention of ruining Mr. Burt's character."

The only complaint against appellee shown to have been made to the Navy Department, other than complaint of failure to make remittances in accordance with his agreement, is contained in a letter written the Department on February 2, 1921, explaining the cause of her separation from her husband and answering statements made to the Department by appellee regarding the separation. The statement in this letter is as follows:

"Mr. Burt, after a career so scandalous that I do not feel at liberty to ·burden the bureau with all the details, insisted on a separation, and signed an agreement of which I inclose the original, dated January 24, 1918. I remained away from Mr. Burt until May 3, 1918, and during that time I received most penitent letters from him, one of which I inclose. On his promise to reform I returned to Mr. Burt on May 3, 1918, and we established our home at 5025 Pulaski avenue, Germantown, Pa. We were hardly settled before my husband became worse than ever, and he remained away from home for days at a time usually returning intoxicated. In a desperate effort to avoid the scandal of a separation and because I believed that drink was the cause of his conduct I forgave him repeatedly."

Appellee still being in arrears with his remittances to appellant, she came to Galveston in the spring of 1922 for the purpose of obtaining a settlement with him. Upon her arrival here she learned that he had filed a suit for divorce against her, alleging that her residence was unknown, and had obtained service by publication. While the evidence shows that appellee did not have her address at that time, he knew that she was living in or near New York and knew that he could obtain her address by writing to a friend in New York. After learning of this divorce suit, appellant employed attorneys to bring suit against appellee for the amount claimed to be due her by him. She also went to appellee's place of employment in Galveston and much against his will and to his embarrassment insisted on having an interview with him. In this interview she inquired of him whether he intended to continue to support her, and he told her that he did not. Upon making this report to her attorneys she was advised to make a criminal charge against him for nonsupport. She did this and in the affidavit made in support of the charge she swore that she was in destitute circumstances. On the day she made this affidavit, or a day or two previous thereto, she had received $125 which appellee had paid her attorney for her, and of course was not actually in destitute circumstances.

The foregoing is believed to be the substance of all the material testimony contained in the record. The disagreeable task of setting out all this testimony was deemed proper because of the fact that my dissent is based upon the ground that the judgment of the trial court is not supported by the evidence.

I cannot agree with my Associates that this evidence supports the finding of the trial court that all of the material allegations of plaintiff's petition are true. Appellee is the only witness who testifies to any misconduct on the part of appellant prior to their separation. Appellant expressly denied these charges, and in the letters written her by appellee after the separation he admits, in effect, that he caused all the unhappiness that had come to their married life. Such being the state of the evidence, I do not think that appellee's uncorroborated testimony is sufficient to meet the

burden placed by article 4633 of our statutes upon a plaintiff in a divorce suit to establish the right to a divorce "by full and satisfactory evidence."

In the early case of Moore v. Moore, 22 Tex. 237, our Supreme Court, in construing this statute, says:

"The law has wisely enjoined upon the courts, the duty of watching over these proceedings with the strictest scrutiny, and interposing to prevent abuses of the delicate and responsible power confided to them, to dissolve the marriage contract. What shall be deemed sufficient cause of divorce, must ever be matter of law; and the law has made it the duty of the judge to refuse a decree, unless satisfied of the truth and sufficiency of the evidence, by which those causes are established. Our statute is explicit upon the subject; declaring that 'the decree of the court, shall be rendered upon full and satisfactory evidence, independent of the confession or admission of either party, and upon the verdict of a jury, affirming the material facts alleged in the petition.' * * * There must be the 'full and satisfactory evidence,' and 'the verdict of a jury;' both must concur, before the court can lawfully proceed to decree a divorce. It is to the mind of the court, of course, that the statute intends that the evidence shall be 'full and satisfactory.' Unless it be so, it is the duty of the court to set aside the verdict, and refuse a decree. In decreeing a divorce, the judge does not proceed, as in other cases, upon the verdict of the jury, but upon his own judgment, after the jury, by their verdict, have affirmed the truth of the material allegations of the petition. The mind of the judge must be satisfied, not only of the sufficiency of the causes alleged, but of the truth and sufficiency of the evidence, by which they are established, independently of the verdict."

This opinion has been often cited and uniformly approved and followed by our Supreme Court and other appellate courts.

In the case of McCrary v. McCrary (Tex. Civ. App.) 230 S. W. 187, the rule is elucidated and many of the cases supporting it are cited. The court in the case cited says:

"By the provisions of article 4633 of our statutes, the burden was upon him to sustain that charge by 'full and satisfactory evidence.' Mr. Webster defines the word 'full' as follows: 'The highest state, point, or degree; complete measure; fullest or utmost extent; fullness.'

"In Greenleaf on Evidence, § 2, the following definition is given: 'By satisfactory evidence, which is sometimes called sufficient evidence, is intended 'that amount of proof which ordinarily satisfies an unprejudiced mind beyond reasonable doubt.'

"That definition was quoted with approval by this court in Moore v. Stone, 36 S. W. 909 and many decisions of this state, some of which are cited in that case, were substantially to the same effect. In Baines v. Ullmann, 71 Tex. 529, 9 S. W. 543, it was said: 'Evidence is said to satisfy the mind when it is such as frees the mind from doubt, suspense, or uncertainty.'

"The language used in article 4633, with respect to the quantum of proof required of plaintiff in order to obtain a divorce, was used in its legal significance, and imposes, substantially, the same burden as that imposed upon the state in a criminal prosecution to establish guilt by proof beyond a reasonable doubt. In enacting that statute, it is clear that the Legislature deemed the sanctity of the marriage relation, the interests of society and of the parties involved, of equal importance to that of insuring to an individual his freedom from punishment until his guilt is established beyond a reasonable doubt. And why not? By express provisions of article 6826, Paschal's Digest, the ground for a divorce could not be established by the testimony of either party. That statute remained in force until the year 1897, when it was amended by article 4633, Revised Statutes, so as to allow either party to testify."

But conceding, for the sake of argument, that the evidence is sufficient to justify the finding that all of appellee's charges of misconduct by appellant are true, he should neverthless be denied a divorce because, by his own admissions, appellant's mistreatment of him was provoked by his mistreatment of her. The rule that recrimination is a valid defense to suit for divorce is well settled by our court decisions, and as said by our Supreme Court, in the case of Hale v. Hale, 47 Tex. 336, 26 Am. Rep. 294, "rests in the clearest reason and in exact justice."

The doctrine is applicable in any divorce case in which the acts of which the plaintiff complains are induced or occasioned by the acts or conduct of plaintiff, unless the acts complained of are so grossly in excess of the provocation that they cannot be reasonably held to have been occasioned thereby.

"But [as said in the Hale Case] it is not sufficient that the plaintiff should be merely less in fault than the defendant. He has no cause to complain or right to be relieved from the obligation of a contract which he has violated in a like manner as the defendant; and where the difference between himself and the defendant is merely a slight difference in their degree of guilt, the court will not interfere."

This doctrine has been uniformly recognized and applied by the courts of this state. Beck v Beck, 63 Tex. 35; Bohan v. Bohan (Tex. Civ. App.) 56 S. W. 959; Staples v. Staples (Tex. Civ. App.) 136 S. W. 120; Dickinson v. Dickinson (Tex. Civ. App.) 138 S. W. 205.

Without discussing the facts before set out, which I think speak for themselves, it seems clear to me that the opinion of the majority affirming the judgment of the trial court is in direct conflict with the decisions above cited.

It may be conceded that the evidence in this case shows that appellee and appellant can no longer live happily together as husband and wife and that the continuance of such relationship would, in the language of the statute, be "insupportable" to both of them; but to my mind the further irresisti-

ble conclusion from the evidence is that this unfortunate situation has been brought about by the misconduct of the appellee, and under the settled law as declared in the decisions above cited he is not entitled to a divorce relieving him of the obligations of his marriage contract. In cases of this kind the law regards the welfare of society of more importance than the happiness of the individual, and forbids the dissolution of the contract of marriage at the suit of one who by his own misconduct has induced or occasioned the acts or conduct of the defendant which the plaintiff claims renders the living together of the parties insupportable.

In such case the parties should be left in the situation they have mutually created, with their hope of future connubial happiness depending on their mutual repentance and forgiveness.

In my opinion the judgment of the court below should be reversed, and the appellee be denied a decree of divorce.