## BUCKNER v. BUCKNER.
### No. 1880.

Court of Civil Appeals of Texas. Beaumont.
March 7, 1930.

Rehearing Denied April 17, 1930.

W. T. Davis, of San Augustine, for appellant.

Bogard & Anderson, of San Augustine, for appellee.

WALKER, J.

This was a suit for divorce instituted by appellant against appellee on allegations that appellee's conduct towards her was so intolerable as to render their living together impossible. On trial to the court without a jury the divorce was denied.. It is the contention of appellant that on the undisputed evidence she was entitled, as a matter of law, to a divorce. Her testimony, corroborated in some respects by other witnesses, was as follows:

"While we were living on that farm we sent the children over there to that little school until after Marion got to be a pretty good sized girl when I decided we would send her up here to school and my sister bought a place and said we would stay here in the winter and send the children to school, and so we moved up here, but he didn't tell me he didn't want to move here. I told my husband at that time my reason and purpose in moving to San Augustine, and he gave the children's ages in here himself. The understanding was to send them to school and I was to stay during the winter months, and so was he. He didn't even say that he didn't want to come. I believe we moved to San Augustine in September 1924. We moved here in 1924, down next to Judge Wilkerson's in a house that belonged to my sister. She had bought that place and we moved into it about September 13th. We stayed there that time until the school had closed the next May. Mr. Buckner stayed here the biggest part of the time. After school was out we went to the farm and stayed all that summer.

"I took the children back there, and Mr. Buckner was running a sawmill, and I cooked for the two niggers he had there and the nigger boy that Lewis had there. We made a crop that year, and I stayed until about August 1st. Then I came back up here and brought the children with me. No objection was made to that by Mr. Buckner. Mr. Lewis kept coming on back then; that is the winter baby Lewis Jr. was born—in September. There had been no disagreement between me and Mr. Buckner about coming up here up to that time. He continued to come up here, but not as often as he did.

"That Fall and winter the children went to school. Mr. Buckner didn't complain after the baby was born; his mother and father moved down there with him, and he would come on up here and bring things for a while, but later on he quit bringing anything like he did; I mean he would kill beeves and bring things up here for us that we needed, from the farm. After Christmas he didn't bring any more. His mother told me she told him not to kill any more beeves and bring them here as it was a waste to kill them that way, and he never brought any more.

"After that he sometimes treated me very well, and sometimes he would be on the 'sulls' and wouldn't say anything. He didn't tell me the basis of his complaint or conduct. That

conduct continued until about June 1926. He quit coming here in June; that is when he was to go to the farm. He handled the cotton crop and all the crops raised on the place; he handled everything. I had charge over nothing but the chickens.

"As to how he provided for me and the children, well, he would buy a few things along to eat, but he didn't buy us anything in the way of clothes to amount to anything. My sister bought me about all the clothes I got, and most of the children's. I asked him for a pair of shoes the summer we moved up here, and he wouldn't get them for me and I had to sell peaches to get them. I don't know what he did with the cotton crop that year. I dont know exactly what was made in 1926. He didn't tell me. He quit coming up at all in June, and wouldn't have anything to do with me; he never come on the place any more for thirteen months. I filed suit about 12 months after that. I filed the suit because I had no support and no way to support the children, and I needed help, and I thought it was his duty to help to support them. He wouldn't speak to me and didn't come on the place from June until I sued him. He had ceased all relations with me.

"Yes, I finally filed suit. That was settled by agreement, and I dismissed it. After we were reconciled the understanding was that if I would stay down there in the summer he would come up here in the winter and continue to send the children to school. He didn't say about providing for the children. When I went down there in the summer I was to assist him and maintain marital relations. I went down there with that understanding. It was also understood that he was to provide for me and the children and to give more attention to the family.

"We came back up here about every Saturday, but he was just as anxious to come to town as I was. We would all come and I would send the children to Sunday school on a Sunday. I sent my children back here in September when school started. I stayed down there until October. The children stayed with my sister. There was no understanding as to where they would remain at that time. I asked him if he would help her pay some on the place, and he said No, and I stayed there until October, and she got a job of nursing and that is all the way she had of paying the note on her place, and of course I had to go and stay with the children then. We never have paid any rent or anything since we have been there.

"I dont know just when he finished gathering the crop that year, but it was some time in the Fall. I think it was gathered about the time I came back.

"Mr. Buckner would come up here sometimes and stay until Mondays, and sometimes until Tuesday morning. During that time he treated us very well. He didn't provide any too well. He bought the children some clothes but he didn't buy me anything. I dont know what became of the cotton crop. I dont remember how many bales of cotton he made in 1927, but he bought some from the nigger boy and paid him the money for them, and there was 16 bales in all there, that Fall. Yes, that was in 1927. I didn't get but very little of it. He bought the children some shoes and a coat apiece—and the coats for the other children he gave me $32.00—and I asked him to buy me a coat and he wouldn't do it. I dont know what became of all the 1927 crop. There was just what he bought for the children and what he paid on the grocery bill. He sold some of that crop before Christmas. As to what became of the other, well, he had seven bales down there just a week before school was out, the 21st of May he went down there and told me he was going home and bringing the cotton up here and sell it, and he went and got it and there was a bale down at the house that had been there about three years, and he came up to the house to get it. That made 8 bales. He sold it to Cade Downs, and he got 20 cents a pound. I have an account of the sales. Yes, that made 8 bales for that 1927 crop that he sold that day. I didn't get a penny of it.

"There wasn't any money spent on the children. I think the grocery bill was $13.00, and he went up there and paid it to Mr. Johnson, and I owed some more but he didn't pay them. I had bought Elizabeth a dress for her to go to school, and a pair of shoes at Clark Downs, and told them to charge them to him, but later they sent the bill to me and I paid it when I had those pipeline boarders. I paid it out of the earnings of my boarding house. And we built a garden when we first went down there and I charged that wire to him—it was $5.10 at Enloe Millers—and I worked the garden,—and I paid for that wire at Enloe Miller's when I had those boarders last fall, out of my earnings.

"After school was out in 1928 Mr. Buckner never did come back there any more. He came until the week before school was out, and that was the day he sold the cotton, and I begged him not to carry off that other bale, and he said the only way I could stop him was to get a lawyer and the sheriff. He stayed there that night and the next morning I got breakfast and he didn't say a word to me, but went and got his clothes and packed up everything of his that he could find, and I just told him and said 'Lewis you have brought all this on yourself, what do you want to do this way for,' and he never made me any reply, but got in his truck and drove off, and he was to come after us to go to the farm I thought and he didn't come back, but on Tuesday he come up in the car and blowed the horn and I went out there but he didn't want to say anything to me, and he blowed the horn again, and I told

him the children were at Aunty's and they would be there in a little, but he didn't get out and he went on back to town, and after awhile he came back and the children came and he talked to them, and he just told me that we couldn't get along together and there wasn't no use for us to try and live together, but if the children will go down there I will support them, and I told him to take the children and let them help in the crop, but he didn't take them, and he told me he was going to stop the bills.

"I guess he did stop the bills. I phoned Mat Johnson next morning for some things, and he said 'I cant charge anything to Lewis. He has told me he wouldn't pay it,' and I said 'Well, Mr. Mat haven't I always paid my bills,' and he said 'Yes, anything you want you can get charged to you, but I wont charge it to him.' That is what he told me over the phone.

"I dont know what became of Mr. Buckner. He went to the farm. He has never come back to see me since or had any association with me whatever.

"He has treated the children very well since that time. We went down there and stayed a week and canned fruit, and he treated the children good, and it looked like they enjoyed themselves together. He didn't have anything to do with me down there. I thought I would talk to him but he went out on the front porch; and I sat down by him and asked was there many at the graveyard working, and he just said 'I didn't count them,' and I didn't ask him any more. I never have been down there since then, and he hasn't been back to see me.

"That mostly occurred after school was out last year. He didn't furnish me anything from that time until I filed the suit on December 20th, 1928. I don't know how much cotton he made down there this last year exactly. Mr. Dwires' little girl told me that the nigger boy made 8 bales, and Lewis made 6, and that gave him 10. I only know that from hearsay; yes sir. I dont know how much corn he made; he had a pretty crop when I was there, nice. roasting ears and all. I dont know how much he got, nor how much syrup either. They told me it was between 300 and 400 gallons but I dont know that to be a fact.

"I dont know of any bills he has paid for the family since that time. He gave Marion $5.00 to get her a pair of shoes. I haven't received anything out of the 1928 crop, nor from any of the corn or syrup.

"As to how I have made a living, well, I took those pipeline boarders and kept them awhile, and I took in sewing before Christmas, and my sister's nursing and everything she made went for the children and kept up the place. I kept the children in school and they are in school now. My sister Allie Barron is paying their expenses for wearing apparel etc.

I assist in the way that I can make anything, but I haven't had hardly any work to do since Christmas. I am not receiving anything from Mr. Buckner, nor are the children. That condition has existed since last May.

"I just cant live with him any more, because I have gone through more than anybody else would have. He has impressed me by his conduct that he has ceased to care for me. I certainly mean that, because no man never treated anybody like he did me. Under the circumstances I dont believe that he and I could ever live together as husband and wife.

"I have tried to raise those children right, and kept them in the best of company, and in Sunday School. I surely have put all my knowledge and labor in trying to raise the children. The present status of the children as to growth, age, education and moral character has been largely produced by me. I know I am capable of giving them the best attention and rearing them to womanhood.

"After the defendant left me he abandoned all relations with me whatever. Since that time he has not voluntarily furnished any money for their education and support, unless the bills at the drug store is charged to him for their school supplies. I have called upon my sister to assist me in helping provide for the children, and keeping them in school."

Appellee's father testified, in his behalf, in part as follows:

"Yes, I have known Lewis' wife ever since they were married. As to whether I have ever had a conversation with her about going back and living with Lewis, well, me and Mrs. Buckner were coming from Neuville I think, going back down there and had come down the highway and I wanted to see Lewis about something and we went down by the house and Lewis wasn't there, and I asked her where he was and she said she didn't know, and I told her I wanted to see him and she said 'Well, I dont know where he is at,' and I said 'Emma are you figuring to go back home when school is out' and she said 'No, I'm not going back, and I dont think I will ever live there any more.'"

## Opinion.

 Construing appellant's testimony most strongly in her favor, she has convicted appellee of nothing more than abandonment and failure to support her and the children, which, of itself, short of the statutory period, is not a ground for divorce. Barrett v. Barrett (Tex. Civ. App.) 131 S. W. 821; Loring v. Loring, 17 Tex. Civ. App. 95, 42 S. W. 642, 643. It is her proposition that the "insults" shown by her testimony constitute, as a matter of law, the cruel treatment denounced by article 4629, R. S. 1925. In this she is in error. A series of studied vexatious and deliberate insults and provocations, without apprehension of personal violence or bodily hurt, would constitute the intolerable treatment contemplated

314

by the statute. Burt v. Burt (Tex. Civ. App.) 261 S. W. 407. But in order to warrant a divorce on the ground of such conduct the defendant's treatment of the plaintiff must be such as to produce a degree of mental distress calculated to impair the health of plaintiff, Eastman v. Eastman, 75 Tex. 473, 12 S. W. 1107; Bush v. Bush (Tex. Civ. App.) 103 S. W. 217; Claunch v. Claunch (Tex. Civ. App.) 203 S. W. 930, and must have been perpetrated willfully with the intent of injuring plaintiff. McNabb v. McNabb (Tex. Civ. App.) 207 S. W. 129. The statutory grounds for divorce should be strictly construed, Blake v. Blake (Tex. Civ. App.) 263 S. W. 1075, and, unless the trial court is satisfied of both the truth and the sufficiency of the evidence relied upon, the divorce should be refused, article 4632, R. S. 1925; Moore v. Moore, 22 Tex. 237. Where the divorce has been refused, the judgment should not be reversed, merely on the facts, unless it clearly appears from all the testimony in the record that the trial court has plainly erred in refusing the divorce. Duffer v. Duffer (Tex. Civ. App.) 144 S. W. 354. Upon a careful review of the entire statement of facts we cannot say that the court plainly erred in refusing appellant a divorce.

The judgment of the lower court is therefore affirmed.